**Revised August 27, 1998**

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 96-60385
_____

LINDA ANNE SCOTT,

　　　　Plaintiff - Appellee - Cross-Appellant,

versus

UNIVERSITY OF MISSISSIPPI,

　　　　Defendant - Appellant - Cross-Appellee.

---

Appeal from the United States District Court
For the Northern District of Mississippi

---

July 27, 1998

Before EMILIO M. GARZA, STEWART, and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The University of Mississippi ("University") appeals the judgment entered against it following a jury trial in this Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., case brought by Linda Anne Scott. Holding that Scott failed to adduce sufficient evidence from which a jury could reasonably infer discrimination and, therefore, that the district court erred in denying judgment as a matter of law to the University, we reverse.

In 1991, the University of Mississippi School of Law (the "Law School") hired Linda Anne Scott as a reference librarian in the Law School library. In 1993, when she was 54 years old, Scott applied for the position of legal writing specialist, a ten-month contractual, non-tenure-track position (the "1993 hiring"). To make the hiring decision, the law school convened a four-member committee, consisting of David E. Shipley, Professor and then Dean of the Law School, Larry S. Bush, Associate Professor, Larry Pittman, Assistant Professor, and Sylvia Robertshaw, Director of the Law School's legal writing program. From twenty-six total applicants, the committee selected six finalists, ultimately ranking Sandra Shelson first, Anne Gullick second, and Scott third.[1] At that time, Gullick was thirty-three years old. The committee first offered the position to Shelson, who declined the offer, and then to Gullick, who accepted it. After learning of the decision to hire Gullick, Scott filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC") and, one year later, in 1994, this law suit. In early 1995, when a legal writing specialist position again became available, Scott applied for it (the "1995 hiring"). Of thirty-three applicants, Scott was again one of the finalists, but she was

---

[1] Scott does not challenge the committee's ranking or selection of Shelson, the only applicant who had experience teaching legal writing.

not offered the position.

Scott's original complaint set forth a claim of age discrimination for the 1993 hiring. She later amended her complaint to include a claim of age discrimination for the 1995 hiring and a claim that her not being hired in 1995 was retaliation for filing her age discrimination claim for the 1993 hiring (the "second amended complaint"). Before trial, the University submitted motions in limine (1) to exclude or limit the testimony of Scott's expert, Mark Baggett; (2) to limit Scott's evidence of retaliation to those claims of retaliation raised in her second amended complaint; and (3) to exclude all testimony regarding age discrimination in the 1995 hiring. The court allowed Baggett to testify about the 1993 hiring, but, finding that Scott had not timely supplemented Baggett's opinions related to the 1995 hiring, disallowed his testimony about the 1995 hiring. The court next granted the University's motion regarding evidence of retaliation, limiting Scott to the charges of retaliation raised in her second amended complaint. Finally, with respect to the 1995 hiring, the court ruled that Scott could testify "in terms of retaliation but not as a separate discrimination claim" because she had not presented the age discrimination claim to the EEOC.

The court thus submitted two claims to the jury: (1) an age discrimination claim for the 1993 hiring, and (2) a retaliation claim for the 1995 hiring. The jury returned a verdict in favor of Scott on the age discrimination claim, but in favor of the

-3-

University on the retaliation claim. Before the court gave the jury its instructions, the parties stipulated that the court would determine the question of damages upon a verdict for Scott. After the jury rendered its verdict, the court ordered the University to hire Scott as a legal writing specialist at the next vacancy and awarded her front and back pay. Both parties submitted motions for judgment as a matter of law at the close of evidence and after the verdict.

The University contends on appeal that the district court erred (1) in concluding as a matter of law that it did not have Eleventh Amendment immunity from suit under the ADEA; (2) in denying its motion for judgment as a matter of law because the evidence was insufficient to support Scott's age discrimination claim; and (3) in admitting Baggett's testimony regarding the 1993 hiring. Scott cross-appeals the jury verdict on the retaliation claim, raising evidentiary issues only. Specifically, she claims that the court erroneously excluded Baggett's testimony regarding the 1995 hiring and evidence of retaliation after Scott filed her second amended complaint. Scott also challenges the court's refusal to allow evidence about her claim of age discrimination in the 1995 hiring. Both parties also appeal various issues related to damages.[2] Because the Eleventh Amendment, when applicable,

---

[2]     Because we reverse the judgment entered in favor of Scott on the age discrimination claim, we do not reach the issue of damages or the University's evidentiary challenges.

-4-

imposes a limitation on our jurisdiction, *see Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54, 116 S. Ct. 1114, 1122, 134 L. Ed. 2d 252 (1996), we turn first to that issue.

## II

The district court held, without explanation, that Congress had abrogated the states' Eleventh Amendment immunity from suit under the ADEA and that Scott's ADEA suit was therefore not barred by the Eleventh Amendment. The University disagrees, arguing that it is immune from suit under the ADEA.[3]

"The Eleventh Amendment provides immunity to states from suits in federal court by private persons." *Coolbaugh v. Louisiana*, 136 F.3d 430 (5th Cir. 1998), *petition for cert. filed*, 66 U.S.L.W. 3783 (U.S. May 28, 1998) (No. 97-1941). That immunity is, however, not without limit: "A state may consent to be sued in federal court, and in certain circumstances, Congress may abrogate the

---

[3] Three circuits have addressed this issue since *Seminole Tribe*. Two have held that Congress abrogated the states' Eleventh Amendment immunity from suit under ADEA. *See Goshtasby v. Board of Trustees of the Univ. of Ill.*, 141 F.3d 761 (7th Cir. 1998); *Hurd v. Pittsburgh State Univ.*, 109 F.3d 1540 (10th Cir. 1997). One has reached the opposite result. *See Kimel v. State of Fla. Bd. of Regents*, 139 F.3d 1426, 1433 (11th Cir. 1998) (concluding that "nothing in the ADEA indicates a truly clear intent by Congress to abrogate Eleventh Amendment immunity"). District courts have split on the issue, with the minority reaching the opposite result of *Goshtasby* and *Hurd*. *See, e.g.*, *MacPherson v. University of Montevallo*, 938 F. Supp. 785 (N.D. Ala. 1996) (holding that Congress did not abrogate states' Eleventh Amendment immunity in enacting the ADEA), *aff'd*, 139 F.3d 1426 (11th Cir. 1998).

states' sovereign immunity."[4]  *Goshtasby v. Board of Trustees of the Univ. of Ill.*, 141 F.3d 761, 765 (7th Cir. 1998) (citing *Seminole Tribe*, 517 U.S. at 63-66, 71 n.15, 116 S. Ct. at 1128, 1131 n.15; *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S. Ct. 2666, 2671, 49 L. Ed. 2d 614 (1976)).  In *Seminole Tribe*, the Supreme Court outlined a two-part inquiry for determining whether Congress has abrogated the states' sovereign immunity from suit under the Eleventh Amendment in enacting particular legislation: "first, whether Congress 'has unequivocally expressed its intent to abrogate the immunity,' and second, whether Congress has acted 'pursuant to a valid exercise of constitutional power.'" *Seminole Tribe*, 517 U.S. at 55, 116 S. Ct. at 1123 (internal citation omitted) (quoting *Green v. Mansour*, 474 U.S. 64, 68, 106 S. Ct. 423, 426, 88 L. Ed. 2d 371 (1985)).  The University contends that in extending the ADEA to the states, Congress satisfied neither of these prongs.

                                    A

   Congress's intent to abrogate state sovereign immunity "must be obvious from 'a clear legislative statement.'" *Seminole Tribe*, 517 U.S. at 55, 116 S. Ct. at 1123 (quoting *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 786, 111 S. Ct. 2578, 2584, 115 L. Ed. 2d 686 (1991)).  Congress may abrogate state sovereign immunity

---

[4]    Here, the University has not consented to suit.

"only by making its intention unmistakably clear in the language of the statute." *Id.* at 56, 116 S. Ct. at 1123 (quoting *Dellmuth v. Muth*, 491 U.S. 223, 109 S. Ct. 2397, 105 L. Ed. 2d 181 (1989)). "A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Dellmuth v. Muth*, 491 U.S. at 231, 109 S. Ct. at 2402, 105 L. Ed. 2d 181 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246, 105 S. Ct. 3142, 3149, 87 L. Ed. 2d 171 (1985)). Instead, both the text and structure of the statute must "make[] it clear that the State is the [intended] defendant to the suit." *Seminole Tribe*, 517 U.S. at 57, 116 S. Ct. at 1124. Congress is not required, however, to "explicitly reference to state sovereign immunity or the Eleventh Amendment." *Dellmuth*, 491 U.S. at 233, 109 S. Ct. at 2403 (Scalia, J., concurring).

As originally passed, the ADEA was enacted pursuant to the Commerce Clause and applied only to private sector employers. Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 602 (codified as amended at 29 U.S.C. § 621 *et seq.*). In 1974, Congress amended the ADEA (the "1974 Amendment") to cover state and local government employees by expanding the definition of "employer" to include "a State or political subdivision of a State and any agency or instrumentality of a State."[5] Fair Labor

---

[5] At the same time, Congress also amended the definition of "employee" to include "employees subject to the civil service laws of a State government." Fair Labor Standards Amendments of 1974,

-7-

Standards Amendments of 1974, Pub. L. No. 93-259, § 28(a)(2), 88 Stat. 55, 74 (codified as amended at 29 U.S.C. § 630(b)(2)).  We find that this reference to the "State" in the 1974 Amendment evidences a clear statement that Congress intended to subject the states to suit in federal court.  *See Ramirez v. Puerto Rico Fire Serv.*, 715 F.2d 694, 701 (1st Cir. 1983) ("[T]he ADEA's express authorization for the maintenance of suit against state employers comprises adequate evidence to demonstrate the congressional will that Eleventh Amendment immunity be abrogated.").

Further compelling evidence of Congress's intent to abrogate the states' sovereign immunity is the ADEA's enforcement provision and its explicit incorporation of the enforcement provision of the Fair Labor Standards Act ("FLSA").  The ADEA section, 29 U.S.C. § 626(b), provides that "[t]he provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provided in . . . § 216 (except for subsection (a) thereof) . . . and subsection (c) of this section."[6]  Section 216(b) provides in pertinent part that "[a]n action to recover the liability prescribed . . . may be maintained against any employer (including a public agency) in any Federal or State court of competent

_____

Pub. L. No. 93-259, § 28(a)(4), 88 Stat. 55, 74 (codified as amended at 29 U.S.C. § 630(f)).

[6]    Section 626(c)(1) provides: "Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter."

-8-

jurisdiction by any one or more employees."[7]  29 U.S.C. § 216(b).

"Public agency" is defined in 29 U.S.C. § 203(x) as including "the

government of a State or political subdivision thereof."  *See Hurd*,

109 F.3d at 1544 n.3 (holding that Congress clearly intended to

abrogate state immunity for ADEA, reasoning, in part, that "the

[FLSA] enforcement provisions which the ADEA now references

specifically authorize ADEA suits in federal court").

Accordingly, we hold that the language of § 626(b) and §

216(b) in conjunction with the specific extension of the ADEA to

state employers unequivocally expresses Congress's intent that

state employers may be sued under the ADEA in federal courts.  *See*

---

[7]      In *Employees of Department of Public Health & Welfare v. Department of Public Health & Welfare, Missouri*, 411 U.S. 279, 93 S. Ct. 1614, 36 L. Ed. 2d 251 (1973), the Supreme Court affirmed the district court's dismissal of plaintiffs' FLSA suit on the grounds of Eleventh Amendment immunity.  Following that decision, Congress amended § 216(b) to its current form "to make it clear that suits by public employees to recover unpaid wages and liquidated damages under such section may be maintained in a Federal or State court of competent jurisdiction" and to "overcome" the Supreme Court's decision in *Employees*.  H.R. Rep. No.93-913, at 45 (1974).  That section had previously read that an "[a]ction to recover such liability may be maintained in any court of competent jurisdiction."
        The University argues that Congress's failure to make the same change to the jurisdictional section of the ADEA that it did to § 216(b) of FLSA))even though the amendment to § 216(b) was part of the same amendment that extended the ADEA to the states))implies that Congress did not intend to abrogate states' Eleventh Amendment immunity from suit under the ADEA.  *Compare* 29 U.S.C. § 216(b) *with* 29 U.S.C. § 626(c)(1). In making this argument, however, the University fails to discuss § 216(b) of FLSA or, more importantly, the ADEA's explicit incorporation of that section in the ADEA through § 626(b).  We therefore find the University's argument unpersuasive.

-9-

*Goshtasby*, 141 F.3d at 766 (concluding that "'[u]nless Congress had said in so many words that it was abrogating the states' sovereign immunity in age discrimination cases))and that degree of explicitness is not required))it could not have made its desire to override the states' sovereign immunity clearer'") (quoting *Davidson v. Board of Governors of State Colleges & Univs. for W. Ill. Univ.*, 920 F.2d 441, 443 (7th Cir.1990)).

B

Having decided that Congress intended to abrogate the states' Eleventh Amendment immunity in extending ADEA coverage to the states, we next consider whether in doing so Congress acted "pursuant to a valid exercise of power."[8] *Seminole Tribe*, 517 U.S. at 55, 116 S. Ct. at 1123. In *Seminole Tribe*, the Court concluded that Congress has constitutional authority to abrogate the Eleventh Amendment immunity of the states through its powers under § 5 of the Fourteenth Amendment, but not through its powers under the Commerce Clause. *Id*. at 59, 66, 116 S. Ct. at 1125, 1128 (overruling *Pennsylvania v. Union Gas*, 491 U.S. 1, 109 S. Ct. 2273,

---

[8]     Neither the Supreme Court nor our circuit has decided whether the 1974 Amendment may be upheld as a valid exercise of Congress's power under § 5 of the Fourteenth Amendment. The Supreme Court specifically declined to decide this issue in *EEOC v. Wyoming*, 460 U.S. 226, 243, 103 S. Ct. 1054, 1064, 75 L. Ed. 2d 18 (1983) (holding that "[t]he extension of the ADEA to cover the state and local governments . . . was a valid exercise of Congress' powers under the Commerce Clause," and concluding that the Court "need not decide whether it could also be upheld as an exercise of Congress' powers under § 5 of the Fourteenth Amendment").

105 L. Ed. 2d 1 (1989)). We must determine, therefore, whether the extension of ADEA coverage to the states was a valid exercise of Congress's powers under § 5 of the Fourteenth Amendment.

At the outset, we reject the University's contention that Congress's enforcement powers under § 5 are limited to suspect classifications. *Coolbaugh* clearly establishes that Congress's § 5 enforcement powers are not limited to suspect classifications. *See Coolbaugh*, 136 F.3d at 433-34 (reaching this conclusion in determining that Congress abrogated the states' Eleventh Amendment immunity in enacting the Americans with Disabilities Act ("ADA")); *see also Goshtasby*, 141 F.3d at 770 ("The fact that age is not a suspect qualification does not foreclose Congress from enforcing the Equal Protection Clause through an enactment protecting against arbitrary and invidious age discrimination.").

Congress did not explicitly state that it was enacting the 1974 Amendment pursuant to § 5 of the Fourteenth Amendment. The University accordingly argues that because Congress did not mention the Fourteenth Amendment in the 1974 Amendment to the ADEA, it was not acting pursuant to its § 5 enforcement powers. It is true that, as the Supreme Court has warned, "we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16, 101 S. Ct. 1531, 1539, 67 L. Ed. 2d 694 (1981). However, contrary to the University's assertion,

-11-

Congress need not "recite the words 'section 5' or 'Fourteenth Amendment' or 'equal protection,' for '[t]he . . . constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *EEOC v. Wyoming*, 460 U.S. 226, 243 n.18, 103 S. Ct. 1054, 1064 n.18, 75 L. Ed. 2d 18 (1983) (quoting *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144, 68 S. Ct. 421, 424, 92 L. Ed. 2d 596 (1948)). Instead, we look to the structure of the ADEA as well as its legislative history in determining whether Congress relied on its § 5 enforcement power to enact the 1974 Amendment. *See Goshtasby*, 141 F.3d at 766-68; *see also Coolbaugh*, 136 F.3d at 435-37 (reviewing Congressional findings and legislative history of ADA in determining that Congress acted within its § 5 enforcement power in enacting the ADA).

In *City of Boerne v. Flores*, ___U.S.___, 117 S. Ct. 2157, 2163, 138 L. Ed. 2d 624 (1997), the Supreme Court reiterated that the Congress's § 5 enforcement power encompasses legislation that carries out the objectives of the Fourteenth Amendment. Moreover, it clarified that "[l]egislation which deters or remedies [Fourteenth Amendment] constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" *Id.* (quoting *Fitzpatrick*, 427 U.S. at 455, 96 S. Ct. at

-12-

2671). Thus, as the *Flores* Court reaffirmed, Congress has, under its § 5 enforcement power, "the authority to both remedy and prevent constitutional violations." *Coolbaugh*, 136 F.3d at 434; *see also Flores*, ___ U.S. at ___, 117 S. Ct. at 2164 (emphasizing that Congress's § 5 enforcement power, which the Court has described as remedial, is limited to enforcing the provisions of the Fourteenth Amendment).

In *Coolbaugh*, we concluded that "Congress is authorized to adopt legislation that remedies or prevents unconstitutional conduct, provided there is a 'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Coolbaugh*, 136 F.3d at 435 (quoting *Flores*, ___ U.S. at ___, 117 S. Ct. at 2164). We are guided in our determination of this issue by the two-part proportionality inquiry set out in *Coolbaugh*, where we explained that "[t]his proportionality inquiry has two facets: the extent of the threatened constitutional violations, and the scope of the steps provided in the legislation to remedy or prevent such violations." *Coolbaugh*, 136 F.3d at 435. To determine "the extent of the threatened constitutional violations"))the first prong of the proportionality test))we examine Congress's findings regarding the evils it was addressing in passing the ADEA. As stated in the ADEA's preamble, Congress found that "in the face of rising productivity and affluence, older workers find themselves

-13-

disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs."   29 U.S.C. § 621(a)(1).   It further found that "the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons."[9]   29 U.S.C. § 621(a)(2). Congress concluded that   "[i]t is therefore the purpose of this Act to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment."  29 U.S.C. § 621(b).   In addition to these statements by Congress, the Secretary of Labor reported the following, based on "the extensive factfinding undertaken by the Executive Branch and Congress" prior

---

[9]   Congress also set forth the following additional findings:

> (3)   the incidence of unemployment, especially long-term unemployment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave;

> (4)   the existence in industries affecting commerce, of arbitrary discrimination in employment because of age, burdens commerce and the free flow of goods in commerce.

29 U.S.C. § 621(a).

to the enactment of the ADEA:

> Although age discrimination rarely was based on the sort
> of animus motivating some other forms of discrimination,
> it was based in large part on stereotypes unsupported by
> objective fact, and was often defended on grounds
> different from its actual causes. . . . Moreover, the
> available empirical evidence demonstrated that arbitrary
> age lines were in fact generally unfounded and that, as
> an overall matter, the performance of older workers was
> at least as good as that of younger workers.

*Wyoming*, 460 U.S. at 231, 103 S. Ct. at 1057 (citing Report of the Secretary of Labor, The Older American Worker: Age Discrimination in Employment (1965)).

Although the legislative history of the 1974 Amendment is somewhat sparse, it evidences that "Congress subsequently established that these same conditions existed in the public sector." *Goshtasby*, 141 F.3d at 772 (citing S. Rep. No. 93-846, at 112 (1974); 118 Cong. Rec. 7,745 (1972) (remarks of Sen. Bentsen)[10]). Congress indicated its purpose in passing the 1974

_____

[10]    In introducing a prior, unsuccessful bill extending coverage of the ADEA to federal, state, and local employees, Senator Bentsen made the following remarks:

> [T]here are strong indications that the hiring and firing
> practices of government units discriminate against the
> elderly, frequently pressuring them into retiring before
> their productive days are over. . . . [W]hatever the
> form, the pressures directed against older Government
> employees constitute flagrant examples of age
> discrimination in employment, and as such, they should be
> outlawed. . . . Quite apart from any economic arguments,
> the central issue is whether we want to give older
> workers a feeling that they can still contribute, that
> their age is no bar to a productive life. If we fail to
> give our older citizens an equal chance in employment
> decisions, we may add to the feeling of uselessness which

Amendment by quoting the following remarks:

> As the President said in his message of March 23, 1972, supporting such an extension of coverage under the ADEA: "Discrimination based on age))what some people call 'age-ism'))can be as great an evil in our society as discrimination based on race or religion or any other characteristic which ignores a person's unique status as an individual and treats him or her as a member of some arbitrarily-defined group. Especially in the employment field, discrimination based on age is cruel and self-defeating; it destroys the spirit of those who want to work and it denies the Nation[] the contribution they could make if they were working."

H.R. Rep. No. 93-913, at 40-41 (1974). Senator Bentsen made the following remarks regarding the 1974 Amendment: "The passage of this measure insures that Government employees will be subject to the same protections against arbitrary employment based on age as are employees in the private sector." 120 Cong. Rec. S8,768 (1974).

Giving these congressional findings the substantial deference that we must, *see Coolbaugh*, 136 F.3d at 435, we find that the legislative history of the ADEA supports Congress's findings that discrimination on the basis of age presented a serious and common problem. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S. Ct. 1701, 1706, 123 L. Ed. 2d 338 (1993) ("Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and

---

is so prevalent among older Americans today. 118 Cong. Rec. S7,745-46 (1972).

-16-

stigmatizing stereotypes."); *EEOC v. Elrod*, 674 F.2d 601, 604 (7th Cir. 1982) (holding that the legislative history of the ADEA supports a conclusion that the purpose of the ADEA was "to prohibit arbitrary, discriminatory conduct that is the very essence of the guarantee of 'equal protection of the laws' of the Fourteenth Amendment").

The remaining part of our inquiry is "whether the scope of the [ADEA] is so 'sweeping' that the statute cannot be seen as proportional to the evil Congress sought to address." *Coolbaugh*, 136 F.3d at 437. In *Goshtasby*, the Seventh Circuit summarized the scope of the ADEA as follows:

> The purpose of the ADEA is "to prohibit arbitrary age discrimination in employment." The ADEA attempts to redress and prevent discrimination and stereotyping of older Americans by requiring that determinations be based on merit. See *Hazen Paper Co.*, 507 U.S. at 611, 113 S. Ct. at 1706 ("The employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly."). Thus, the ADEA requires personalized determinations based on facts. If however, youth is a bona fide occupational qualification that is reasonably necessary to the normal operation of the particular business, an employer may use age as a criterion for employment decisions. . . . The ADEA, as applied by the courts, ferrets out instances of arbitrary age discrimination.

*Goshtasby*, 141 F.3d at 772 (citations omitted). As the Seventh Circuit opined, "unlike the statute at issue in *Flores*, which imposed 'the most demanding test known to constitutional law,' the ADEA is narrowly drawn to protect older citizens from arbitrary and capricious action by the state." *Id.* We agree and, therefore,

-17-

cannot conclude that the remedies imposed by the ADEA "are too sweeping to survive the *Flores* proportionality test for legislation that provides a remedy for unconstitutional discrimination or prevents threatened unconstitutional actions." *Coolbaugh*, 136 F.3d at 438. We accordingly hold that the ADEA represents a valid exercise of Congress's § 5 enforcement power under the Fourteenth Amendment. Thus, the University is not entitled to Eleventh Amendment immunity from suit under the ADEA.

III

The University moved for judgment as a matter of law on Scott's claim of age discrimination at the close of Scott's case, at the close of all the evidence, and after the verdict. On appeal, the University contends that the district court erred in denying these motions because Scott presented insufficient evidence that age was a determinative factor in its 1993 hiring decision.

A

We review a district court's denial of a motion for judgment as a matter of law *de novo*. *See Travis v. Board of Regents of the Univ. of Tex. Sys.*, 122 F.3d 259, 263 (5th Cir. 1997), *cert. denied*, ___U.S.___, 118 S. Ct. 1166, 140 L. Ed. 2d 176 (1998). "A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir. 1997), *cert. denied*, ___U.S.___, 118 S. Ct. 603,

-18-

139 L. Ed. 2d 491 (1997) (internal quotations and citation omitted). We test jury verdicts for sufficiency of the evidence under the standards set forth in *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), *overruled on other grounds*, *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc), viewing all the evidence and drawing all reasonable inferences in the light most favorable to the verdict. *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996) (en banc) (quoting *Boeing*, 411 F.2d at 374).

Under *Boeing*, there must be a conflict in substantial evidence to create a jury question. Thus, a court should grant a motion for judgment as a matter of law "not only when the non-movant presents no evidence, but also when there is not a sufficient 'conflict in substantial evidence to create a jury question.'" *Travis*, 122 F.3d at 263 (quoting *Boeing*, 411 F.2d at 374). "Substantial evidence is defined as 'evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.'" *Rhodes*, 75 F.3d at 993 (quoting *Boeing*, 411 F.2d at 374). "A mere scintilla of evidence is insufficient to present a question for the jury." *Boeing*, 411 F.2d at 374.

We apply the burden-shifting framework expounded by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L.

-19-

Ed. 2d 207 (1981), to ADEA cases. *See Rhodes*, 75 F.3d at 992-93. When a case has been fully tried on the merits, however, "we need not parse the evidence into discrete segments corresponding to" the different stages of the *McDonnell Douglas-Burdine* framework. *Travis*, 122 F.3d at 263. Instead, applying *Boeing*'s sufficiency of the evidence standards, we examine whether the plaintiff has met her ultimate burden of proving that the employer discriminated against her because of age. *See id.*

A plaintiff need not, however, provide direct evidence to sustain a jury finding of discrimination. *See Rhodes*, 75 F.3d at 993. "Because direct evidence is rare in discrimination cases, a plaintiff must ordinarily use circumstantial evidence to satisfy her burden of persuasion." *Id.* Circumstantial evidence must be such, however, "as to allow a rational factfinder to make a reasonable inference that age was a determinative reason for the employment decision." *Id.* Moreover, to give rise to such an inference of discrimination, the employee must provide some evidence, direct or circumstantial, to rebut each of the employer's proffered reasons and allow the jury to infer that the employer's explanation was a pretext for discrimination. *See Swanson v. General Servs. Admin.*, 110 F.3d 1180, 1185 (5th Cir. 1997), *cert. denied*, ___U.S.___, 118 S. Ct. 366, 139 L. Ed. 2d 284 (1997); *EEOC v. Texas Instruments Inc.*, 100 F.3d 1173, 1180 (5th Cir. 1996). "The trier of fact may not simply choose to disbelieve the

-20-

employer's explanation in the absence of any evidence showing why it should do so." *Swanson*, 110 F.3d at 1185.

Although "[i]n tandem with a prima facie case, the evidence allowing rejection of the employer's proffered reasons will often, perhaps usually, permit a finding of discrimination without additional evidence," *Rhodes*, 75 F.3d at 994, it does not always do so. *See Travis*, 122 F.3d at 263 (explaining that even if a plaintiff's evidence "permit[s] a tenuous inference of pretext and, by extension, discrimination," the evidence may "be insufficient as a matter of law to support a finding of discrimination"). "[A] jury issue will be presented and a plaintiff can avoid . . . judgment as a matter of law if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that age was a determinative factor in the actions of which plaintiff complains." *Rhodes*, 75 F.3d at 994. On the other hand, an employer will be entitled to judgment as a matter of law "if the evidence taken as a whole would not allow a jury to infer that the actual reason for the [employer's decision] was discriminatory." *Rhodes*, 75 F.3d at 994.

B

With these principles in mind, we turn to the case at hand. Arguing that there is no evidence to support the jury's verdict of discrimination, the University characterizes this case as the

-21-

proverbial second-guessing of its decision that Gullick was more qualified than Scott. The University consistently asserted throughout trial))and continues to argue on appeal))that while Scott was highly qualified for the legal writing specialist position, she was simply not the most qualified. As the University has repeatedly pointed out, and Scott has not disputed, the committee ranked Scott third out of the twenty-six applicants for the 1993 hiring and would have offered the position to Scott if Gullick had refused the offer and Scott's reference check was satisfactorily concluded.

Scott contends that she did in fact present sufficient evidence of age discrimination. Scott first claims that the University's reasons for not hiring her were pretextual, thus providing circumstantial evidence of discrimination. Scott further argues that, apart from the evidence specifically refuting the University's reasons for not hiring her, she presented other direct and circumstantial evidence showing that the University's decision was motivated by age. We address in turn the various components of Scott's evidence.

1

In support of its 1993 hiring decision, the University produced several reasons why the committee ranked Gullick second and Scott third. At trial, three of the four members of the 1993 hiring committee testified as to their reasons for ranking Gullick over Scott. All three emphasized Gullick's four and a half years

of federal district court clerkship experience, viewing that favorably over Scott's one-year Mississippi Supreme Court justice clerkship. Bush in particular valued this credential, considering a federal clerkship to be the "best apprenticeship you can have for teaching law at any level." The members also cited Gullick's very favorable letters of recommendation; Bush noted that the three judges for whom Gullick had worked had given her strong letters of recommendation. The committee members considered the quality and extent of Gullick's legal writing experience to be superior to Scott's, a criterion they all considered crucial for the position. In addition to the writing experience she gained while clerking, they emphasized her experience writing briefs on a contract basis for attorneys in Memphis. Pittman noted that Gullick had written and argued briefs during this time, even arguing at least one before the Sixth Circuit. Finally, although they all thought Scott interviewed well, they believed Gullick's interview to be stronger than Scott's. Testifying that Gullick came across as "very enthusiastic" and "forceful" in her interview, Pittman viewed her interview and work experience so favorably that at one time he considered ranking Gullick over even Shelson. Although Bush noted that Scott gave one of the better interviews of the finalists, he praised Gullick as being very outgoing and very assertive, resulting in a strong interview. While the committee members viewed Scott's Ph.D. and prior college-level teaching experience very positively, considering the latter to be much more extensive

than Gullick's two years of high school teaching, they found these other reasons to warrant ranking Gullick one notch above Scott.

Several of these reasons were included in the Affirmative Action report the Law School filed with the University's Affirmative Action office. The report, which was completed and submitted after the initial ranking, explained first why Shelson was selected. The report then explained why other applicants were deselected.[11] With respect to Gullick, the report stated:

> Ms. Gullick had significant legal writing experience both as a law clerk for four years at the trial court level and as a practicing attorney, but she had no significant teaching experience. Ms. Gullick has written briefs and has argued at least one federal appellate case. She had a strong interview, but lacks significant teaching experience.

---

[11] Scott argues that the reasons provided by the University other than in the Affirmative Action report are highly suspect, *post hoc* rationalizations. This contention is easily rejected. The Affirmative Action report undisputedly describes the reasons Shelson was selected over the other candidates. Moreover, Scott presents no evidence that the explanations given by the committee members for ranking Gullick second and Scott third were not the members' legitimate reasons at the time of their decision. *See EEOC v. Louisiana Office of Community Servs.*, 47 F.3d 1438, 1445-46 (5th Cir. 1995) (rejecting EEOC's argument that the standards used by the employer in making its promotion decision were *post hoc* rationalizations: "[W]e decline to substitute our judgment for the employer in evaluating what types of experience are most valuable for an employee in the new position in the absence of proof that the standards were not consistently applied or were so irrational or idiosyncratic as to suggest a cover-up."); *cf. Lloyd v. Georgia Gulf Corp.*, 961 F.2d 1190, 1195 & n.7 (5th Cir. 1992) (explaining that jury could reasonably infer that employer's explanation of poor performance was "'an after the fact inspiration triggered by the necessity of fending off litigation" when no supporting documentation of poor performance existed in employee's personnel file) (quoting *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 124 (5th Cir. 1992)).

-24-

With respect to Scott, the report stated:

> Although Ms. Scott has a substantial amount of English teaching experience and one year of clerking at the appellate level, she had no teaching experience in legal writing. Moreover, Ms. Scott has never worked in the class room with collaborative groups, which is a significant part of the pedagogy of the Legal Writing Program.

Citing all of these reasons, the University adamantly contends that Scott simply presented no evidence showing that these sound, professional reasons, or the committee's reliance on them, were false, let alone a pretext for age discrimination.

Scott disagrees, claiming that she established a genuine issue for trial about the legitimacy of each of the nondiscriminatory reasons offered by the University for ranking Gullick over her. She first challenges the Affirmative Action report's statement that Scott was deselected because she had neither taught legal writing nor worked with collaborative groups. Scott claims that these reasons are pretexts for discrimination because Gullick had not taught legal writing either, Robertshaw did not even ask Gullick about collaborative groups, and Robertshaw testified that collaborative groups were not that important and that there was nothing particularly difficult about them. The University responds by pointing out that the Affirmative Action report to which Scott refers sets forth the University's reasons why Shelson was selected and the other applicants were deselected,[12] not why Gullick was

_____

[12] Shelson was the only candidate who had previously taught legal writing, and, according to the report (as well as the

-25-

selected and Scott deselected))a fact that Scott does not dispute. Thus, the University argues, Scott does not effectively refute its reasons for preferring Gullick over Scott and, in fact, merely restates the reasons why it preferred Shelson over Scott and Gullick.  We agree.

Scott next challenges the University's explanation that Gullick had more extensive legal writing and research experience. She attempts to rebut this explanation by pointing out that she was teaching legal research to first-year law students at the time of the 1993 hiring and that she had more than ten years experience teaching college-level English.  She also argues that the committee's ranking of Gullick over Scott based on writing skills could not be true because the committee made its initial ranking without the benefit of Scott's writing samples.

At the outset, we note that neither the Affirmative Action report nor the committee members' testimony indicates that the

---

committee members' testimony), this was the primary reason the committee ranked Shelson over Gullick and Scott.  The record indicates that the fact that Scott had no experience teaching with collaborative groups was relevant to the comparison of Scott to Shelson.  Robertshaw explained at trial that she asked Scott about her experience with collaborative groups to determine the relevance of her prior teaching experience to the legal writing position. Furthermore, nothing in the record indicates that any of the committee members ever contended that Gullick's teaching experience was a plus factor for Gullick.  In fact, Robertshaw explained that she did not ask Gullick about collaborative group teaching because Gullick's only experience teaching was at the high school level, something which all of the committee members testified weighed against her when compared to Scott.

committee cited Gullick's *research* skills as a reason for ranking Gullick over Scott. Thus, any attempt Scott makes to rebut such a reason is irrelevant. The University did, of course, repeatedly mention legal writing experience as a basis for ranking Gullick over Scott. Scott's first two reasons here))her experience teaching English and her experience teaching legal research))do not, however, cast suspicion on the committee's opinion that Gullick's legal writing experience was superior to Scott's experience and instead present only a mismatched comparison.

With respect to the writing samples, the record indicates that Scott submitted her writing samples to the committee shortly after its June 14th meeting, at which time the committee ranked the finalists.[13] The relevancy of this fact to the committee's stated

---

[13] Bush, one of the committee members, was responsible for informing the interviewees that they had been selected for an interview. He was to tell them at the time he scheduled their interviews that they needed to provide the committee with writing samples when they arrived for their interview. Bush testified that he forgot to tell Scott to bring a writing sample to the interview. He explained that when he invited the other candidates, he did so on the telephone from his office, where he referred to a list of things he wanted to tell the candidates; when he informed Scott of her selection for an interview, however, he walked downstairs to the library and did not have his list for reference. Scott testified that she was asked for her writing samples at her interview, which was on a Thursday, but was not able to give them to the committee until Monday because she had to go home to Gulfport to retrieve them.

The committee met on the morning of that Monday, June 14th. The record indicates that while the rankings made at that meeting were subject to certain contingencies, including, among other things, reference checks of the top two candidates, these rankings were approved by the Dean and remain unchanged as a result of the reference checks and the resolution of the other contingencies.

reasons for its decision is, however, not evident. The reason offered by the University for ranking Gullick over Scott was the quality of Gullick's legal writing experience as compared to Scott's. The record indicates that the committee members based their opinions of Gullick's legal writing experience on Gullick's federal clerkship experience, her subsequent brief-writing work, and her letters of recommendation))none of which Scott is able to rebut. Moreover, the only trial testimony elicited of the committee members regarding their consideration of writing samples was Robertshaw's testimony that although she reviewed some of Gullick's writing samples, she read Scott's writing samples at about the same time she read Gullick's.[14] For these reasons, we conclude that Scott has failed to present evidence rebutting the University's reliance on Gullick's legal writing experience in ranking Gullick over Scott.

Scott is unable to present evidence refuting any of the University's other reasons for ranking Gullick over Scott. Most notably, she does not attempt to refute the committee's reliance on Gullick's federal clerkship experience, which was arguably the committee members' primary reason for ranking Gullick over Scott, other than by introducing statements that a Mississippi Supreme

_____

[14] With respect to her opinion of the writing samples, Robertshaw testified that while Scott's writing samples were "pretty good," they did not affect her opinion of Scott's ranking in relation to Gullick, who submitted a brief that Gullick wrote for an appeal to the Sixth Circuit and that Robertshaw considered "very outstanding."

Court clerkship is comparable to a federal clerkship.  In fact, in her brief, Scott concedes that Gullick possessed this qualification and she did not.  "Where the plaintiff has offered no evidence to rebut the employer's facially benign explanations, no inference of discrimination can be drawn."  *EEOC v. Louisiana Office of Community Servs.*, 47 F.3d 1438, 1447 (5th Cir. 1995); *see also id.* at 1448 ("[T]he only evidence [of discriminatory intent] is the EEOC's own speculation that age motivated the decision not to promote Fisher.  We have consistently held that an employee's subjective belief of discrimination, however genuine, cannot be the basis of judicial relief.").

Despite this lack of evidence rebutting the University's proffered legitimate, nondiscriminatory reasons for ranking Gullick second and her third, Scott claims that not only was she better qualified than Gullick, she was *clearly* better qualified. Specifically, she claims that the jury could have found that her Ph.D. in English, Masters in Library Science, college teaching experience, Mississippi Supreme Court clerkship, and experience teaching legal research to law students compared to Gullick's B.A. in English, federal clerkship, and two years teaching high school made Scott so clearly better qualified that the University's reasons for not selecting Scott must have been pretexts for age discrimination.

We have held that "a plaintiff can take his case to a jury

with evidence that he was *clearly better qualified* than younger employees" who were selected for the position at issue.[15] *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 123 (5th Cir. 1992) (emphasis added); *see also Louisiana Office of Community Servs.*, 47 F.3d at 1444 ("A factfinder can infer pretext if it finds that the employee was 'clearly better qualified' (as opposed to merely better or as qualified) than the employees who are selected."). "However, this evidence must be more than merely subjective and speculative." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996). "To establish a fact question as to relative qualifications, a plaintiff must provide sufficiently specific reasons for his opinion; mere subjective speculation will not suffice." *Id*. Moreover, in pursuing this inquiry, we recognize that "the judicial system is not as well suited by training and experience to evaluate qualifications . . . in other disciplines as are those persons who have trained and worked for years in that field of endeavor for which the applications under consideration are being evaluated." *Louisiana Office of Community Servs.*, 47 F.3d at 1445. Thus,

---

[15] In *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 959 n.8 (5th Cir. 1993), we questioned whether this proposition remains viable in light of the Supreme Court's decision in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) because "[a]rguably, evidence showing the plaintiff was 'clearly better qualified' establishes only that the employer's proffered reasons were pretextual and not that they were a pretext for age discrimination, as required by *St. Mary's*." Because we conclude that Scott has failed to present evidence that she was clearly better qualified than Gullick, we need not reach that question today.

"[u]nless disparities in curricula vitae are so apparent as virtually to jump off the page and slap us in the face, we judges should be reluctant to substitute our views for those of the individuals charged with the evaluation duty by virtue of their own years of experience and expertise in the field in question." *Id.*

To support her assertion that she was clearly better qualified than Gullick, Scott presents her testimony and the testimony of Mark Baggett, her expert.[16] Scott testified that she had a Ph.D. and a Masters degree in English in addition to her law degree, while Gullick had only a law degree. She cited her extensive teaching experience compared to Gullick's two years of teaching high school. She also compared her Mississippi Supreme Court clerkship to Gullick's federal clerkship, concluding that her clerking experience was superior to Gullick's. She also noted that one of the two professors as well as a group of students who gave their opinions of the candidates to the committee ranked her one ahead of Gullick. (The other professor listed both Gullick and Scott in his top three, but did not rank them within that group.).

Scott also points to the testimony of her expert, Mark Baggett, who teaches English literature and composition in the English department as well as legal writing and research in the law school at Cumberland University. Baggett stated that Scott was

_____

[16] On appeal, the University challenges the admission of Baggett's testimony regarding the 1993 hiring on three grounds. Because we reverse the judgment entered in favor of Scott on the age discrimination claim, we need not consider these arguments.

-31-

"clearly better qualified" for the legal writing position than Gullick. He based this decision primarily on Scott's Ph.D. in English because it requires a dissertation, which he described as a very rigorous writing project, and involves teaching. He also cited her experience in private practice, her degree in Library Science, and her job as reference librarian at the Law School's library as further supporting his opinion. Finally, Baggett testified that a State Supreme Court clerkship and a federal clerkship are generally comparable in the extent of legal research and writing.

The University contends that Scott's evidence, including her and Baggett's testimony, did nothing more than present a difference of opinion as to whether Scott or Gullick was better qualified for the job and, therefore, did not establish either directly or through inference that the University intentionally refused to hire Scott because of her age. We agree. Their testimony, as well as our review of the resumes and other documents included in the record, is insufficient evidence that Scott was *clearly* better qualified and, therefore, does not suffice to present a jury question as to pretext.[17] Scott's comparison of her qualifications

---

[17]    We note that Baggett's statement that Scott was "clearly better qualified" for the legal writing position cannot by itself be sufficient to create a jury question on discrimination; like Scott, Baggett must present specific reasons supporting this conclusion. *Cf. Nichols*, 81 F.3d at 42 ("To establish a fact question as to relative qualifications, a plaintiff must provide sufficiently specific reasons for his opinion.").

with Gullick's simply does not reveal any "glaring distinction" that would reasonably support a conclusion that she was clearly better qualified than Gullick. *See Odom v. Frank*, 3 F.3d 839, 846 (5th Cir. 1993) ("Their respective statements of 'specific qualifications' are quite different, but neither is particularly more impressive than the other. A careful and objective comparison of Price's and Odom's applications reveals no glaring distinction that would support a finding that Odom was 'clearly better qualified than [Price] for the . . . position.'"). We note first that in comparing her qualifications to Gullick's, Scott understates Gullick's qualifications. She refers to Gullick's four and a half years of federal clerkship experience merely as a "federal clerkship" and does not even mention, for example, Gullick's other legal writing experience. Scott's teaching experience is, of course, much more extensive than Gullick's. On the other hand, the record reveals that Gullick had more extensive legal writing experience; for example, the record indicates that Gullick had significant brief-writing experience, while Scott testified that she had written only one brief other than the briefs she had written for this lawsuit. Furthermore, like Scott's, Baggett's comparison of Scott's qualifications with Gullick's simply does not reveal any "glaring distinction" that would reasonably support a conclusion that Scott was clearly better qualified or, more importantly, that the University discriminated

-33-

against Scott on the basis of age.[18] In fact, his testimony undermined Scott's in one respect: while she claimed that her clerkship was superior to Gullick's, Baggett testified that they were comparable.

In sum, we conclude that Scott's qualifications are not "so superior" to those of Gullick's "to allow an inference of pretext." *Louisiana Office of Community Servs.*, 47 F.3d at 1445. We see no "disparities in curricula vitae [that] are so apparent as virtually to jump off the page and slap us in the face." *Id.; see also Odom v. Frank*, 3 F.3d 839, 847 (5th Cir. 1993) ("We find that neither singly nor collectively do Odom's qualifications leap from the record and cry out to all who would listen that he was vastly))or even clearly))more qualified for the subject job than was Price."). Disagreements over which applicant is more qualified are employment decisions in which we will not engage in the practice of second guessing. *See Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1507-08 (5th Cir. 1988) ("The ADEA was not intended to be a

---

[18] This conclusion is bolstered by the fact that the district court qualified Baggett as an expert only in legal writing, explicitly limiting Baggett to testifying about legal writing ability (specifically, Scott's legal writing ability as compared to Gullick's), and not about hiring decisions. Thus, as the district court expressly ruled, Baggett was not an expert on hiring decisions. Nor could he be in this specific instance. He had not, for example, met or interviewed any of the candidates or read the letters of recommendation submitted by the applicants to the committee. His opinion was based mainly on Scott's and Gullick's resumes and writing samples, including the writing samples submitted to the committee as well as two documents Scott prepared for this litigation.

vehicle for judicial second-guessing of employment decisions, nor was it intended to transform the courts into personnel managers."); *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) ("[W]e do not sit as a super-personnel department that reexamines an entity's business decisions."). Even if evidence suggests that a decision was wrong, we will not substitute our judgment as to who was more qualified for the employer's business judgment. *See Bienkowski*, 851 F.2d at 1508 ("The ADEA cannot protect older workers from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated"). Such disputes do not support a finding of discrimination and have no place in front of a jury.

2

Scott next claims that statistical evidence shows that the Law School had a policy of not hiring tenure-track professors or legal writing teachers over the age of forty. She specifically relies on the fact that the five legal writing teachers hired by the University's law school during the relevant period were all under forty years old. She also claims that from 1986 through 1995, few professors over the age of forty were hired, and the few who were hired were significantly younger than Scott. In denying the University's first partial summary judgment motion, the district court referred to this evidence, noting that "it may be significant that the law school has hired only one person in the over-forty age

bracket since 1986 as a regular full-time professor" and that "[t]hose in the protected age group who have been employed were hired as 'visiting professor' or 'adjunct professor' or 'professor emeritus' or 'acting professor.'" The University challenges Scott's proposed evidence of a discriminatory hiring policy first by arguing that Scott ignores evidence in the record that refutes her data and second by claiming that her assertion of a discriminatory hiring policy is flawed as a statistical matter.

Assuming *arguendo* that Scott's data accurately states the ages of professors and legal writing teachers hired during the stated periods, we nonetheless agree with the University that Scott's asserted statistical evidence is fatally flawed and does not support an inference of age discrimination. We have previously stated that while statistical evidence "may be probative of pretext in limited circumstances," it "usually cannot rebut the employer's articulated nondiscriminatory reasons." *Texas Instruments*, 100 F.3d at 1184-85 ("[P]roof of pretext, hence of discriminatory intent, by statistics alone, would be a challenging endeavor.") (citing *Walther*, 977 F.2d at 162); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993) ("[A] company's overall employment statistics will have little direct bearing on the specific intentions of the employer when dismissing a particular individual."). This insufficiency is especially true here because, as the University argues, Scott failed to compare the persons hired

to the pool of qualified applicants when she presented this purported statistical evidence of discriminatory hiring practice.[19] *See Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1286-87 (5th Cir. 1994) ("Where plaintiffs use statistical evidence to challenge an employer's hiring practices, that evidence, to be probative of discriminatory intent, must compare the relevant portion of the employer's work force with the qualified population in the relevant labor market."); *id*. at 1287 ("Actual applicant flow figures are the preferred method by which to measure an employer's hiring practices and performance."). Such an omission renders her evidence invalid for purposes of rebutting the University's reasons for ranking Gullick over Scott and for raising an inference of discrimination.[20]

3

---

[19]    We note that Scott does not argue that she attempted to obtain this information or that she was prevented from doing so.

[20]    As the University argues, without such information, nothing prevents us from surmising that Scott was the only or one of the very few applicants for the five legal writing positions who was over the age of forty. And this flaw is no less germane to her data regarding the tenure-track professors who were hired during the time period referred to by Scott. In fact, without information regarding the applicant pool, one plausible explanation of Scott's hiring data))and perhaps the only explanation appearing in the record))is that provided by the University's witness, Carolyn Staton, the University's Associate Vice Chancellor for Academic Affairs and former Dean of the Law School, who testified that "the problem you might see with certain people who are coming in the tenure trac[k] jobs being younger is that people who have been in the profession a long time don't like to take the fifty, sixty, seventy thousand dollar cut that they would have to take to become a law teacher."

At oral argument, Scott made much of the fact that Robertshaw wrote down on her copy of Scott's resume the dates that Scott received her graduate degrees from the University of Mississippi, arguing that this fact allows for a reasonable inference of age discrimination. Scott claimed that the effect of this action was exacerbated because Robertshaw dominated the search committee.

Robertshaw explained at trial that she asked Scott about these dates to determine the relevancy of Scott's course work to the legal writing teaching position))she "wanted to find out when [Scott] had done her graduate work in English because the use of multiple drafts and collaborative groups and the things that we used in the [legal writing] program really didn't develop until about the early to the mid 80s." In denying the University's motion for judgment as a matter of law, the district court relied on Robertshaw's notation of these dates, finding that Robertshaw's testimony about her concerns of when Scott received her advanced English degrees "clearly raised the specter of age." The court further found that "the jury was entitled to believe Scott's argument that Robertshaw's position as director of the legal writing program would carry more weight with the other members of the selection committee."

The University argues that Robertshaw's noting of the dates Scott attended graduate school is no evidence at all of age discrimination. The University points out that Robertshaw's explanation for asking Scott about the dates remained undisputed in

-38-

the record.  It emphasizes that age was never mentioned during any of the committee meetings and that Robertshaw did not relate either the graduation dates or her conversation with Scott about collaborative groups methods to the other members. Finally, the University counters Scott's argument that Robertshaw dominated the search committee by stressing that the search committee was composed of the dean of the law school, a tenured professor, and an associate, tenure-track professor in addition to Robertshaw and that the trial testimony of the other committee members revealed that they felt that the hiring decision was just as important to them as to Robertshaw.

At first blush, Robertshaw's act of writing down the dates Scott received her graduate degrees appears, as the district court stated, to raise the specter of age.  On further inspection, however, we disagree with the district court.  Viewing this evidence in the light most favorable to Scott, perhaps the most the jury could reasonably infer was that Robertshaw noted Scott's graduation dates on her resume as a rough indication of Scott's age.  However, even if Robertshaw had noted Scott's actual age on her resume, this single notation, without other evidence of its import, is insufficient to support a reasonable inference of discrimination.  *See Corneveaux v. CUNA Mut. Ins. Group,* 76 F.3d 1498, 1504 (10th Cir. 1996) (holding that a reasonable jury could have concluded that age played determinative role in hiring process

where employer wrote down plaintiff's and other job applicants' ages, "sometimes underlining, circling or calculating ages on the applicants' resumes or other relevant documents," and "admit[ted] to underlining and circling  things he thought were 'important' or 'relevant' about an applicant").  As the Eighth Circuit concluded in a case that the University cites and we find persuasive on this point:

> Nor do we believe that the fact that the district manager knew Mr. Nelson's age could furnish the basis for a reasonable inference that his age was a basis for his termination.  A fact finder may not simply convert a condition that is necessary for a finding of liability (here, knowledge of a plaintiff's age) into one that is sufficient for such a finding.

*Nelson v. J.C. Penny Co., Inc.,* 75 F.3d 343, 345 (8th Cir.), *cert. denied*, - U.S. -, 117 S. Ct. 61, - L. Ed. 2d - (1996) (vacating the jury verdict for plaintiff Nelson on his age discrimination claim and remanding for entry of judgment in favor of the employer); *see also May v. Shuttle, Inc.*, 129 F.3d 165, 173 (D.C. Cir. 1998), *cert. denied,* - U.S. -, 118 S. Ct. 2320, 141 L. Ed. 2d 695 (1998) (explaining that supervisor's knowledge of workers' ages and how much it cost the company to keep them employed was insufficient to show unlawful motivation); *Jang v. Biltmore Tire Co.*, 797 F.2d 486, 489 n.3 (7th Cir. 1986) (concluding that testimony that supervisor asked plaintiff about his age "falls far short of constituting direct proof of age discrimination").  Scott does not respond in her brief to the arguments or cases advanced by the University,

and, unearthing no cases suggesting an alternative legal significance of Robertshaw's actions, we conclude that Robertshaw's writing down these dates is insufficient, without more, to support a finding that age was a motivating factor in the University's decision to hire Gullick over Scott.

4

Finally, Scott asserted at oral argument that the jury was entitled to infer discrimination from the evidence that she was treated differently from the other applicants in that the committee did not call her references, did not tell her to bring a writing sample to her interview, and did not take her to lunch when she was interviewed. We can reject this last point in short order because the record reveals that Scott was not the only interviewee not taken out to lunch: Bush testified that the committee did not take Duffy Graham, the last candidate interviewed by the committee, out to lunch. *See Swanson*, 110 F.3d at 1187 (holding that plaintiff had "presented no competent evidence from which the jury could conclude . . . that illegal race discrimination motivated [employer's] decision to deny" plaintiff an in-building parking space where, among other things, white managers of his same level were not provided a parking space). While Scott's other two statements are undisputed in the record, the following facts are also undisputed. After ranking the candidates, Shelson first, Gullick second, and Scott third, the committee decided that only

the top two candidates' references would be called. After Shelson declined the position, the Law School offered it to Gullick. The record indicates that had Gullick refused the offer, the committee would have checked Scott's references and offered Scott the position if the reference check was satisfactory. Under these circumstances, the fact that the committee did not call Scott's references cannot support a reasonable inference of discrimination.

With respect to the writing samples, we note again that while Scott was not informed))as were the other interviewees))at the time her interview was scheduled that she needed to bring her samples to the interview, she was told during her interview that she needed to submit writing samples to the committee.[21]  While the committee's failure to tell Scott to provide writing samples until the date of her interview may support a reasonable inference that the committee was less than conscientious about her application, it does not represent even a mere scintilla of evidence of age discrimination. *See Rhodes*, 75 F.3d at 994 ("[I]f the evidence put forth by the plaintiff to establish the prima facie case and to rebut the employer's reasons is not substantial, a jury cannot reasonably

---

[21]    As we stated previously, Scott's interview was on a Thursday, and the committee meeting was on the following Monday. As we also noted previously, the only trial testimony regarding the committee's consideration of writing samples was Robertshaw's testimony that she read Scott's writing samples at about the same time she read Gullick's and they did not affect her opinion of the candidates' relative rankings. No other committee member was asked or testified about the effect of the delay in the committee's receipt of Scott's writing samples.

infer discriminatory intent.").

For all of the foregoing reasons, we conclude that Scott's evidence, taken as a whole, is insufficient to create a fact issue as to whether each of the University's stated reasons was what actually motivated it and to create a reasonable inference that age was a motivating factor in the University's decision. *See Rhodes*, 75 F.3d at 994; *see also Louisiana Office of Community Servs.*, 47 F.3d at 1448 ("While we or the jury might have made a different employment decision, we should not substitute our judgment of an employee's qualifications for the employer's in the absence of proof that the employer's nondiscriminatory reasons are not genuine. We are persuaded that this is precisely what the jury did here."); *Texas Instruments*, 100 F.3d at 1186-87 (rejecting the EEOC's argument that the district court should not have "discounted each of its type of evidence and ignored that, taken together, all of the agency's evidence bespoke pretext sufficiently to warrant a jury trial" and instead opining that "'[e]vidence' that does not imply pretext taken alone does not do so when cumulated"). We accordingly hold that the district court erred in denying the University's motion for judgment as a matter of law.

IV

Scott raises three evidentiary issues on appeal. First, she claims that the court erroneously excluded Baggett's testimony regarding the 1995 hiring. Second, she argues that the court

erroneously excluded evidence of retaliation after Scott filed her second amended complaint. Finally, Scott contends that the court erred in excluding evidence about her claim of age discrimination in the 1995 hiring. We address each of these rulings in turn.

A

Scott argues that she substantially complied with the discovery rules with respect to Baggett's testimony about the 1995 hiring and, therefore, the district court's ruling excluding this testimony on the grounds of failure to timely supplement was error. Scott, who submitted Baggett's affidavit regarding the 1995 hiring less than six weeks before trial in a response to the University's partial summary judgment motion, does not dispute that she failed to meet the applicable discovery deadlines. Instead, she contends that she supplemented discovery as soon as practicable after the University made available the documents pertaining to the 1995 hiring on which Baggett based his opinion. The record reveals, however, that prior to that Scott had not informed the University that Baggett would be testifying regarding the 1995 hiring. We therefore hold that the district court did not abuse its discretion in excluding this testimony. *See Hester v. CSX Transp., Inc.*, 61 F.3d 382, 388 n.11 (5th Cir. 1995); *see also Alldread v. City of Grenada*, 988 F.2d 1425, 1434 (5th Cir. 1993) (explaining that the district court has wide discretion in determining whether to exclude expert testimony due to failure to comply with discovery

requirements).

Scott's second amended complaint alleged certain acts of retaliation by the University. Less than three weeks before trial, Scott informed the University that she planned to present additional evidence of retaliation arising out of her working environment at the library. She sought to amend her complaint to add these charges of retaliation. In response to the University's subsequent motion in limine on this point, the district court excluded all evidence of retaliation occurring after Scott filed her second amended complaint.

Scott states in her brief that she "was severely prejudiced by denial of an opportunity to put on a substantial part of her proof of retaliatory conduct." In her reply brief, she appears to claim that the University had sufficient notice of at least some of these additional alleged acts of retaliation because she had included them in her response to the University's partial summary judgment motion, which she filed approximately five weeks before trial. She also suggests that she did not need to amend her complaint to add charges of retaliation because the retaliation in her work environment at the library continued to the day of trial, arguing that "amending the complaint after every incident in the Law Library was not feasible and [was] a waste of judicial resources." Scott presents no other explanation why she believes the district court erred in excluding the evidence of retaliation occurring

-45-

after she filed her second amended complaint. Given the time frame in which Scott presented these alleged additional acts of retaliation, we cannot conclude that the district court abused its discretion in excluding evidence of the acts not included in her second amended complaint. *See Information Resources Inc. v. United States*, 996 F.2d 780, 785 (5th Cir. 1993) (holding that district court did not abuse its discretion in excluding claim when party delayed supplementing discovery responses to include the claim until shortly before trial); *EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1092-93 (5th Cir. 1994) (stating that we review evidentiary rulings only for abuse of discretion).

C

Scott lastly contends that the district court erred in excluding testimony about age discrimination in the 1995 hiring. The district court excluded all testimony pertaining to this claim because Scott had not presented the claim to the EEOC. Citing "29 C.F.R. § 16.513 (1988),"[22] Scott argues that amendments to the EEOC regulations have eliminated the exhaustion requirements for age discrimination cases, citing several cases that she claims support this proposition. She also contends that it was not necessary to file this claim with the EEOC because the age discrimination in the 1995 hiring was "intricately intertwined" with the 1993 hiring,

---

[22] Based on our review of the cases Scott cites, it appears that she intended to cite 29 C.F.R. § 1613.513, rather than 29 C.F.R. § 16.513, which does not exist in the federal regulations.

which was already being litigated; she argues that, under this circumstance, the district court has "ancillary jurisdiction" to hear the claim.

The University counters that a plaintiff must submit a charge of age discrimination to the EEOC prior to filing a lawsuit raising an ADEA claim. The University distinguishes the cases cited by Scott, and the regulations cited therein, as applying to only federal and not state government agencies and their employees.

We first reject as incorrect Scott's assertion that an ADEA plaintiff need not exhaust administrative remedies. As we have previously held, "[a] charge of discrimination must be timely filed with the EEOC prior to the initiation of a civil action under the ADEA." *Clark v. Resistoflex Co., Div. of Unidynamics Corp.*, 854 F.2d 762, 765 (5th Cir. 1988) (citing 29 U.S.C. § 626(d), which provides that "[n]o civil action may be commenced by an individual . . . a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission"). Moreover, as the University correctly points out, the cases cited by Scott as supporting the elimination of the EEOC filing requirement are inapposite: those cases concern the interpretation and application of regulations that are sections of 29 C.F.R. Part 1613 (since redesignated as Part 1614), which governs complaints filed by federal employees only. *See Bak v. Postal Serv.*, 52 F.3d 241, 243 (9th Cir. 1995), *cert. denied sub nom. Bak v. Runyon*, ___U.S.___,

118 S. Ct. 374, 139 L. Ed. 2d 291 (1997) (citing 29 C.F.R. § 1613.513); *Adler v. Espy*, 35 F.3d 263, 264 (7th Cir. 1994) (citing 29 C.F.R. § 1613.215(a)(3)); *Bornholdt v. Brady*, 869 F.2d 57, 63 (2d Cir. 1989) (citing 29 C.F.R. § 1613.513); *see also* 62 Fed. Reg. 17,041, 17,043 (1997) ("The Equal Employment Opportunity Commission's regulations governing discrimination complaints filed by Federal employees, formerly found at 29 C.F.R. Part 1613, are now found at 29 C.F.R. Part 1614.").

We also reject Scott's contention that the district court could properly entertain the 1995 discrimination claim because it was intricately intertwined with the 1993 discrimination claim. While we have held that "a district court has 'ancillary jurisdiction' to hear a claim of retaliation, even though not filed with the EEOC, 'when it grows out of an administrative charge that is properly before the court,'" *see Barrow v. New Orleans Steamship Ass'n*, 932 F.2d 473, 479 (5th Cir. 1991) (quoting *Gupta v. East Tex. State Univ*., 654 F.2d 411, 414 (5th Cir. Unit A Aug. 1981)), we have not so held with respect to discrimination claims. *See Gupta*, 654 F.2d at 414 (indicating that this rule is limited to retaliation claims due to the special nature of such claims).

As the district court correctly stated, Scott never presented her ADEA claim concerning age discrimination in the 1995 hiring to the EEOC. We accordingly hold that the district court did not err in excluding testimony regarding her age discrimination claim for

-48-

the 1995 hiring.

VI

For the foregoing reasons, the decision of the district court denying the University's motion for judgment as a matter of law is REVERSED and judgment is hereby RENDERED in the University's favor.