Patrick **ANDERSON**, Plaintiff,

v.

**GOODYEAR TIRE & RUBBER COMPANY**, Defendant.

No. CIV.A. 1:03CV290.

United States District Court,
E.D. Texas,
Beaumont Division.

Dec. 3, 2004.

Joseph Y. Ahmad of Ahmad, Zavitsanos & Anaipakos, Houston, Mark William Frasher, Kip Kevin Lamb and Kenneth Leigh Parker of Lamb Law, Firm, Beaumont, for Plaintiffs.

Elizabeth Brandes Pratt of Mehaffy & Weber Beaumont, for Defendants.

## MEMORANDUM AND ORDER

CRONE, District Judge.

Pending before the court is Defendant Goodyear Tire & · Rubber Company's ("Goodyear") Motion for Summary Judgment (# 26). Goodyear seeks summary judgment on Plaintiff Patrick Anderson's ("Anderson") claims of age discrimination and wrongful termination under the Age Discrimination in Employment Act of 1967, as amended ("ADEA"), 29 U.S.C. § 621, constructive discharge, failure to promote, and hostile work environment under the Texas Commission on Human Rights Act

("TCHRA"), TEX. LAB. CODE ANN. §§ 21.001–21.556, and interference with an employee benefit plan in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140, *et seq.* Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment should be granted in part and denied in part.

I. *Background*

Anderson, born in 1946, is a resident of Jefferson County, Texas, and began working at the Goodyear Plant in Beaumont, Texas, in 1971. Goodyear is an Ohio corporation authorized to do business in Texas. After taking a year off to attend Sam Houston State University to study law enforcement, Anderson returned to Goodyear in August 1973 and worked for approximately 29 years until he was terminated on May 6, 2002, for allegedly "attempting to defraud the company through a false claim for reimbursement for shoes that were not in fact reimbursable safety shoes." Although he was terminated by Goodyear, Anderson elected to exercise his right to retire, which became effective June 1, 2002.

At the time he was terminated, Anderson worked as an associate in the Plant Protection Department where he was responsible for plant security and responding to medical, fire and rescue, and hazardous materials emergencies. According to Anderson, throughout his tenure at Goodyear, he received several job promotions, raises, and accolades. At age fifty-five, Anderson was the oldest employee in his department at the time of his termination. At deposition, Anderson testified that he "had always received favorable evaluations of my performance and all the evaluations I received were positive." According to Richard McCown ("McCown"), who was the Site Safety and Health Leader and Anderson's supervisor at the time he was discharged, Anderson "did an excellent job on Plant Protection duties and responsibilities and around site security and safety and emergency response, which were my three areas of responsibility." McCown testified that he had no complaints about Anderson's performance and that he was going to give him a good evaluation prior to the recommendation from the Plant Manager and the Human Resources Department that Anderson be discharged. Another one of Anderson's supervisors, Paula Larocca, testified that, while she was his supervisor from late 1999 to early 2002, he did a good job.

Prior to his termination, Anderson was accused of engaging in misconduct on two prior occasions. Anderson, however, contends that he "became the target of criticism even though I was not involved in the conduct." In March 1999, Goodyear conducted an investigation related to employees viewing sexually explicit materials during working hours. In a letter dated March 19, 1999, signed by Anderson and the Human Resources Department, Goodyear concluded that Anderson "utilized company provided equipment to view sexually explicit material during working hours" in violation of company policy. Anderson was put on notice that "any additional inappropriate behavior that occurs after this incident will result in immediate dismissal." According to Anderson, however, his co-worker, Van Chesser ("Chesser"), with whom he shared a computer, had allegedly acquired and viewed illicit material over the computer. Because Anderson and Chesser both had access to the computer, they were suspended for nine days while Goodyear conducted an investigation. Anderson maintains that he never saw or brought any explicit materials to work and that he was reprimanded because he shared a locker or cabinet with

Chesser, who was terminated after the investigation.

Another incident of misconduct occurred in November 2001, when Anderson, while on duty, left the plant without authorization for approximately one hour to attend a sheriff's meeting. Anderson had become a certified peace officer in 1989 and was required to attend meetings to maintain his commission as a reserve deputy sheriff. Goodyear conducted another investigation and placed Anderson on a thirty-day leave of absence without pay for unauthorized absence. As a consequence, he forfeited his responsibility for plant locks and keys. Anderson contends that there was no formal policy about leaving the plant and that he had been told that "it was acceptable for salaried employees such as himself to leave the plant for short periods of time (an hour or less) as long as he had a backup." Anderson claims that he asked Randy McCollough of Incident Command for permission to attend the meeting, which he alleges was granted. Anderson also maintains that Doug Jones and McCown remained at the plant and served as backup while he was gone. Nevertheless, after his suspension, he was required to write a "letter of commitment" detailing the seriousness of his violation and acknowledging that any future misconduct would result in termination. Anderson, in his affidavit, stated that "[e]ven though I did not violate any company policy and I felt the discipline was not fair, I did not formally complain but instead took the actions that I was told were required of me to resolve the matter."

After Goodyear's investigation into the most recent incident, the alleged fraud, Richard Pickette ("Pickette"), the Human Resources Manager, and Lou Perfetti ("Perfetti"), the Plant Manager, concluded that Anderson should be terminated. According to Pickette's affidavit, he was alerted by the Payroll/Accounting Depart- ment in April 2002 that Anderson had signed and submitted a claim for reimbursement under Goodyear's Safety Shoe Reimbursement Policy ("the Policy") for shoes that were not steel-toed safety shoes and were not reimbursable under the Policy. Pickette, along with McCown, initiated an investigation into the matter and determined that Anderson had submitted a false claim in violation of the Policy. Perfetti claims that he, Pickette, and McCown all participated in the decision-making process. Consequently, Perfetti, who had the final decision-making authority, determined that, in light of his previous misconduct, termination was the appropriate discipline for Anderson's violation of the Policy. Perfetti further stated that his decision to terminate Anderson in May 2002 "was not based at all on his age or upon any intent to interfere with or deprive him of any of his employment benefits, including employment benefits by Goodyear encompassed within any pension plans or welfare benefit plans."

Anderson, however, maintains that because the explicit language of the Policy allowed him to be reimbursed for shoes for his "personal use," Goodyear's reason for firing him was false and pretextual. He claims that Goodyear's "true motive was to fire [him] due to his age and high salary." After his termination, Anderson filed an employment discrimination charge with the Equal Employment Opportunity Commission ("EEOC") and the Texas Commission on Human Rights on October 10, 2002, alleging that he had been terminated because of his age. On January 14, 2003, the EEOC issued a notice of dismissal or termination of the charge, stating that the information provided to the Commission was insufficient to establish a violation of the statutes and informing Anderson of his right to file a civil lawsuit.

Anderson instituted this action on April 11, 2003, claiming that Goodyear did not have a legitimate, nondiscriminatory reason for terminating him. He asserts that he is the victim of age discrimination and wrongful termination in violation of the ADEA. In addition, he alleges claims of constructive discharge, failure to promote, and hostile work environment under the TCHRA, as well as a claim that Goodyear interfered with his employee benefit plan in violation of ERISA. Subsequently, this action was removed to federal court on May 15, 2003, pursuant to federal question and diversity jurisdiction. Goodyear filed its Motion for Summary Judgment on October 8, 2004, arguing that Anderson has not established a *prima facie* case of age discrimination under the ADEA, has failed to exhaust administrative remedies under the TCHRA, did not work in a hostile work environment, and was not subjected to a violation of ERISA.

## II. *Analysis*

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003); *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002); *Colson v. Grohman*, 174 F.3d 498, 506 (5th Cir.1999).

"A fact is *'material'* if it *'might affect* the outcome of the suit under governing law.'" *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir.2001) (emphasis in original) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505); *see Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir.2001); *Merritt–Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir.1999); *Burgos v. Southwestern Bell Tel. Co.*, 20 F.3d 633, 635 (5th Cir.1994). "An issue is *'genuine'* if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan*, 246 F.3d at 489 (emphasis in original). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *accord Harken Exploration Co.*, 261 F.3d at 471; *Merritt–Campbell, Inc.*, 164 F.3d at 961. The moving party, however, need not negate the elements of the nonmovant's case. *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Rushing v. Kansas City S. Ry. Co.*, 185

F.3d 496, 505 (5th Cir.1999), *cert. denied,* 528 U.S. 1160, 120 S.Ct. 1171, 145 L.Ed.2d 1080 (2000); *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348). All the evidence must be construed "in the light most favorable to the nonmoving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996); *see Reeves,* 530 U.S. at 150, 120 S.Ct. 2097; *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir. 2003); *Harken Exploration Co.,* 261 F.3d at 471; *Daniels v. City of Arlington,* 246 F.3d 500, 502 (5th Cir.), *cert. denied,* 534 U.S. 951, 122 S.Ct. 347, 151 L.Ed.2d 262 (2001); *Colson,* 174 F.3d at 506. The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in his favor. *See Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *Martin v. Alamo Cmty. Coll. Dist.,* 353 F.3d 409, 412 (5th Cir. 2003); *Martinez,* 338 F.3d at 411; *Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503, 507 (5th Cir.), *cert. denied,* 540 U.S. 815, 124 S.Ct. 66, 157 L.Ed.2d 30 (2003); *Chaplin v. NationsCredit Corp.,* 307 F.3d 368, 372 (5th Cir.2002); *Harken Exploration Co.,* 261 F.3d at 471.

Nevertheless, " 'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.' " *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original) (quoting *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1012 (2d Cir.1989)). "If the [nonmoving party's] theory is . . . senseless, no reason-

able jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072. The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little,* 37 F.3d at 1075; *see Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505; *Wallace,* 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)). "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown,* 337 F.3d at 541; *see Bridgmon v. Array Sys. Corp.,* 325 F.3d 572, 577 (5th Cir. 2003); *Hugh Symons Group, plc v. Motorola, Inc.,* 292 F.3d 466, 468 (5th Cir.), *cert. denied,* 537 U.S. 950, 123 S.Ct. 386, 154 L.Ed.2d 295 (2002).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *Wenner v. Texas Lottery Com'n,* 123 F.3d 321, 324 (5th Cir.1997), *cert. denied,* 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

## B. *Abandonment of Claims*

In his response to the summary judgment motion, Anderson does not address

his claims alleging constructive discharge, failure to promote, hostile work environment, and interference with an employee benefit plan and appears to have abandoned them. Indeed, in a footnote on page 2 of his response, Anderson states:

Plaintiff's Response to Defendant's Motion for Summary Judgment will only address his age discrimination claims under the Age Discrimination [in] Employment Act of 1967, 29 U.S.C. 621, *et seq.* Plaintiff agrees to nonsuit all remaining claims with prejudice. Since claims other than Plaintiff's federal age discrimination are therefore moot, Plaintiff will not respond to Defendant's remaining argument concerning those other claims.

Hence, any claims by Anderson regarding these subjects are no longer at issue, as he has agreed to nonsuit these causes of action and did not raise them in his responsive brief. *See Bursztajn v. United States,* 367 F.3d 485, 491 (5th Cir.2004); *Scales v. Slater,* 181 F.3d 703, 709 n. 5 (5th Cir. 1999); *Yohey v. Collins,* 985 F.2d 222, 224–25 (5th Cir.1993); *Friou v. Phillips Petroleum Co.,* 948 F.2d 972, 974 (5th Cir.1991); *see also Davis v. Cannon,* 91 Fed.Appx. 327, 329 (5th Cir.2004).

### C. *Age Discrimination–General Burden of Proof*

▪ The ADEA provides that "it shall be unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *see Reeves,* 530 U.S. at 141, 120 S.Ct. 2097; *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 308–09 (5th Cir.2004); *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 654 (5th Cir.1996); *Stults v. Conoco, Inc.,* 76 F.3d 651, 655 (5th Cir.1996); *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 149 (5th Cir.

1995), *cert. denied,* 516 U.S. 1047, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996); *EEOC v. Louisiana Office of Cmty. Servs.,* 47 F.3d 1438, 1443 (5th Cir. 1995); *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 957 (5th Cir.1993). In essence, the ADEA makes it unlawful for an employee, who is at least forty years old, to be discharged or otherwise subjected to an adverse employment action because of his age. *See Rutland v. Moore,* 54 F.3d 226, 228 (5th Cir.1995) (citing 29 U.S.C. §§ 623(a), 631(a)). "Congress expressly declared that the purposes of the ADEA were 'to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment.'" *Wamsley v. Champlin Ref. & Chem., Inc.,* 11 F.3d 534, 541 (5th Cir.1993), *cert. denied,* 514 U.S. 1037, 115 S.Ct. 1403, 131 L.Ed.2d 290 (1995) (citing 29 U.S.C. § 621(b)). "When a plaintiff alleges disparate treatment, 'liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.'" *Reeves,* 530 U.S. at 141, 120 S.Ct. 2097 (quoting *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)); *see Rachid,* 376 F.3d at 309. "That is, the plaintiff's age must have 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'" *Reeves,* 530 U.S. at 141, 120 S.Ct. 2097 (quoting *Hazen Paper Co.,* 507 U.S. at 610, 113 S.Ct. 1701).

▪ As with other types of employment discrimination, age discrimination may be demonstrated either through direct evidence or by an indirect or inferential method of proof. *See Rachid,* 376 F.3d at

309. "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir.2000); *see Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir.2003); *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 (5th Cir.2003). "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *West*, 330 F.3d at 384 n. 3; *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir.), *cert. denied*, 539 U.S. 926, 123 S.Ct. 2572, 156 L.Ed.2d 602 (2003) (citing *Mooney v. Aramco Serv. Co.*, 54 F.3d 1207, 1217 (5th Cir.1995)). Where, as here, there is no direct evidence of discrimination, the plaintiff must initially establish a *prima facie* case by satisfying a multi-factor test from which a discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *See Reeves*, 530 U.S. at 142, 120 S.Ct. 2097; *Laxton*, 333 F.3d at 578; *Russell*, 235 F.3d at 222; *Wallace*, 80 F.3d at 1047 (citing *Meinecke v. H & R Block of Houston*, 66 F.3d 77, 83 (5th Cir.1995)); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1087 (5th Cir.1994) (citing *Burdine*, 450 U.S. at 252–53, 101 S.Ct. 1089). " 'To establish a *prima facie* case, a plaintiff need only make a very minimal showing.' " *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir.1996) (quoting *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir.1985)).

Once the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate—but not prove—a legitimate, nondiscriminatory reason for its employment decision. *See Reeves*, 530 U.S. at 142, 120 S.Ct. 2097; *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817; *Laxton*, 333 F.3d at 578 (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir.2001), *cert. denied*, 535 U.S. 1078, 122 S.Ct. 1961, 152 L.Ed.2d 1022 (2002)); *West*, 330 F.3d at 384 (citing *Russell*, 235 F.3d at 222); *Rios v. Rossotti*, 252 F.3d 375, 377 (5th Cir.2001); *Okoye v. University of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir.2001). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.' " *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *see West*, 330 F.3d at 385; *Sandstad*, 309 F.3d at 898; *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir.2000). "The [employer] must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, '*if believed by the trier of fact,*' would support a finding that unlawful discrimination was not the cause of the employment action." *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir.1999) (quoting *Hicks*, 509 U.S. at 507, 113 S.Ct. 2742) (emphasis in original); *accord Brown v. Bunge Corp.*, 207 F.3d 776, 781 (5th Cir.2000).

If the employer meets its burden, " 'the *McDonnell Douglas* framework—with its presumptions and burdens'—disappear[s], . . . and the sole remaining issue [is] 'discrimination *vel non*.' " *Reeves*, 530 U.S. at 142–43, 120 S.Ct. 2097 (quoting *Hicks*, 509 U.S. at 510, 113 S.Ct. 2742; *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)); *see Laxton*, 333 F.3d at 578; *West*, 330 F.3d at 385; *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402 (5th Cir.2001); *Russell*, 235 F.3d at 222. "Although intermediate evidentiary burdens shift back and forth under this

framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with with the plaintiff.'" *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089); *accord Hicks,* 509 U.S. at 507–08, 113 S.Ct. 2742; *Laxton,* 333 F.3d at 578; *Crawford,* 234 F.3d at 902; *Vadie v. Mississippi State Univ.,* 218 F.3d 365, 372 (5th Cir.2000), *cert. denied,* 531 U.S. 1113, 121 S.Ct. 859, 148 L.Ed.2d 772 (2001).

■ In attempting to satisfy this burden, under the modified *McDonnell Douglas* approach, the plaintiff must offer sufficient evidence to create a genuine issue of material fact " ' "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive[s] alternative)." ' " *Rachid,* 376 F.3d at 312 (quoting *Rishel v. Nationwide Mut. Ins. Co.,* 297 F.Supp.2d 854, 865 (M.D.N.C.2003) (quoting *Dunbar v. Pepsi–Cola Gen. Bottlers of Iowa, Inc.,* 285 F.Supp.2d 1180, 1197–98 (N.D.Iowa 2003))). If the plaintiff demonstrates that age was a "motivating factor" in the employment decision, the defendant must then prove " 'that the same adverse employment decision would have been made regardless of discriminatory animus.'" *Id.* (quoting *Mooney,* 54 F.3d at 1217). The plaintiff will prevail if the employer fails to carry this burden. *See id.*

■ Under the pretext alternative approach, "[the] plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton,* 333 F.3d at 578 (citing *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097; *Wallace,* 271 F.3d at 220).

"An explanation is false or unworthy or credence if it is not the real reason for the adverse employment action." *Id.* (citing *Sandstad,* 309 F.3d at 899). "[I]t is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097 (emphasis in original); *see West,* 330 F.3d at 385; *Ratliff v. City of Gainesville,* 256 F.3d 355, 360–62 (5th Cir.2001); *Blow v. City of San Antonio,* 236 F.3d 293, 297 (5th Cir.2001). "Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination without further evidence of defendant's true motive." *Laxton,* 333 F.3d at 578; *see Sandstad,* 309 F.3d at 899; *Russell,* 235 F.3d at 223 (citing *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097). "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097; *accord Laxton,* 333 F.3d at 578; *West,* 330 F.3d at 385.

■ Hence, the plaintiff need not, as a matter of course, introduce additional, independent evidence of discrimination to avoid summary judgment. *See Reeves,* 530 U.S. at 148, 120 S.Ct. 2097; *Ratliff,* 256 F.3d at 362; *Blow,* 236 F.3d at 298; *Russell,* 235 F.3d at 223. "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097; *accord Laxton,* 333 F.3d at 578; *Ratliff,* 256 F.3d at 361–62. Ultimately, "[w]hether summary judgment is appropriate depends on

numerous factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case' " and that properly may be considered by the court when ruling on a motion for summary judgment. *Price v. Federal Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (quoting *Reeves*, 530 U.S. at 148–49, 120 S.Ct. 2097); *accord Crawford*, 234 F.3d at 902.

### D. *Discriminatory Discharge*

### 1. *Prima Facie Case under the ADEA*

To establish a *prima facie* case of discriminatory discharge under the ADEA, the plaintiff must show that:

(1) he is a member of the protected class—age forty or older;

(2) he was qualified for the position he held;

(3) he was discharged; and

(4) he was replaced by someone outside the protected class; he was replaced by someone younger; or he was otherwise discharged because of his age.

*See Reeves*, 530 U.S. at 142, 120 S.Ct. 2097; *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir.2003), *cert. denied*, 540 U.S. 1184, 124 S.Ct. 1441, 158 L.Ed.2d 89 (2004); *West*, 330 F.3d at 384; *Russell*, 235 F.3d at 223–24; *Bauer*, 169 F.3d at 966; *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 318–19 (5th Cir.1997).

 It is undisputed that Anderson is a member of the ADEA protected class in view of his age of fifty-five. As for the second prong, Goodyear argues that Anderson was not a qualified employee "due to his repeated acts of misconduct, and particularly since his violations involved issues of trust and integrity." In order to satisfy this prong of a *prima facie* case, the plaintiff need only show "that he continued to possess the necessary qualifications for his job at the time of the adverse action." *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1506 (5th Cir.1988). Possessing the necessary qualifications for the job means that the plaintiff has not suffered some disability or loss of a required professional license or some other event that would render him unqualified for the position for which he was hired. *See id.* at 1506 n. 3. "The lines of battle may then be drawn over the employer's articulated reason for its action and whether that reason is a pretext for age discrimination." *Id.* at 1506. In this case, Anderson's twenty-nine years of work experience, his positive evaluations, and the favorable remarks of his supervisors near the time of his termination, indicate that he was qualified for the position he held. As to the third prong, it is uncontested that Anderson was discharged from his employment on May 6, 2002, but was permitted to retire. Thus, Anderson has established the first three prongs of a *prima facie* case of discriminatory discharge under the ADEA.

 With regard to the fourth prong of a *prima facie* case, the record reflects that Anderson's night shift position was filled by John Downey ("Downey"), an individual in his thirties. Goodyear points out that Anderson's position was filled only after another employee, Justin Arceneaux ("Arceneaux"), who also worked in Plant Protection, gave notice that he was leaving. At that time, Goodyear posted both positions, which were filled by Woodie Cone ("Cone"), a sixty-year-old employee, and Downey. Goodyear contends, therefore, that it was mere happenstance that the younger employee, Downey, filled Anderson's position, and the older employee, Cone, took the position vacated by Arceneaux, which was converted to a day shift job.

Happenstance or not, the evidence in the record establishes that Anderson was replaced by a younger employee. "Replacement of an employee within the protected class—age 40 or older—with an employee outside the protected class—age 39 or younger—constitutes a clear violation under the *McDonnell Douglas* test provided there is a sufficient difference in the age of the two parties." *Fields v. J.C. Penney Co., Inc.*, 968 F.2d 533, 536 n. 2 (5th Cir. 1992). Thus, the fact that Downey, a younger employee in his thirties, filled the position vacated by Anderson, an older employee in his fifties, is sufficient to satisfy the fourth prong of the test and establish a *prima facie* case of discriminatory discharge under the ADEA.

### 2. *Legitimate, Nondiscriminatory Reason*

■■■ Because Anderson has established a *prima facie* case of age discrimination, to avoid liability, Goodyear must set forth an adequate, nondiscriminatory reason for its decision to terminate him. Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See Reeves*, 530 U.S. at 142, 120 S.Ct. 2097; *Hicks*, 509 U.S. at 506–07, 113 S.Ct. 2742; *Rachid*, 376 F.3d at 312; *Laxton*, 333 F.3d at 578; *West*, 330 F.3d at 384; *Sandstad*, 309 F.3d at 897. "The purpose of this step is 'to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent.'" *Stratton v. Department for the Aging for the City of N.Y.*, 132 F.3d 869, 879 (2d Cir.1997) (quoting *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1336 (2d Cir.1997), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998)). "The employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir.1998); *accord Williams*, 98 F.3d at 181; *Acevedo–Diaz v. Aponte*, 1 F.3d 62, 67 (1st Cir.1993). Hence, the defendant's burden is relatively light. *See Greenway*, 143 F.3d at 52.

■■■ "If the employer produces any evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden of production." *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir.1995) (quoting *Hicks*, 509 U.S. at 507, 113 S.Ct. 2742). "The employer's stated legitimate reason must be reasonably articulated and nondiscriminatory, but does not have to be a reason that the judge or jurors would act on or approve." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n. 6 (1st Cir.1979); *see Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984). Indeed, even an employer's incorrect belief that "an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir.1995) (citing *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir.1991)). The articulated reason, however, must be both "'clear and reasonably specific.'" *Okoye*, 245 F.3d at 513 (quoting *Burdine*, 450 U.S. at 258, 101 S.Ct. 1089); *see Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1226 (2d Cir.1994). Furthermore, it "'must be legally sufficient to justify a judgment for the [employer].'" *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir.1998) (quoting *Burdine*, 450 U.S. at 255, 101 S.Ct. 1089); *see Nichols*, 81 F.3d at 41. If the defendant sustains its burden of production, "the presumption raised by the plaintiff's prima facie case essentially disappears, and the plaintiff is

left with the ultimate burden which has never left him: that of proving that the defendant intentionally discriminated against him." *Tanik v. Southern Methodist Univ.*, 116 F.3d 775, 776 (5th Cir.), *cert. denied*, 522 U.S. 1015, 118 S.Ct. 600, 139 L.Ed.2d 488 (1997); *accord Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *Laxton*, 333 F.3d at 578; *West*, 330 F.3d at 385; *Sandstad*, 309 F.3d at 897.

Here, Goodyear has set forth a legitimate, nondiscriminatory reason for terminating Anderson. The record reflects that Goodyear initiated an investigation into a reimbursement claim submitted by Anderson for the purchase of shoes allegedly not in compliance with the Policy. Upon completion of the investigation, Goodyear "concluded that [Anderson] signed [his] own reimbursement application and sought to obtain money for unauthorized equipment." Goodyear further maintains that because Anderson continued to engage in inappropriate behavior and activities that called into question his trustworthiness, he failed to comply with his "letter of commitment" of November 28, 2001, resulting in his termination. Hence, Goodyear has articulated a specific reason for discharging Anderson, which permits the conclusion that such action was not based on a discriminatory animus, thus satisfying Goodyear's burden of production.

### 3. *Pretext for Discrimination*

▇▇▇▇▇ Proceeding under the modified *McDonnell Douglas* pretext alternative approach, because Goodyear has carried its burden of articulating a legitimate, nondiscriminatory reason for its actions, to prevail, Anderson " 'must provide some evidence, direct or circumstantial, to rebut each of the employer's proffered reasons and allow the jury to infer that the employer's explanation was a pretext for discrimination.' " *Rutherford v. Harris County*, 197 F.3d 173, 184 (5th Cir.1999)

(quoting *Scott v. University of Miss.*, 148 F.3d 493, 504 (5th Cir.1998)); *see Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *Hicks*, 509 U.S. at 507–08, 113 S.Ct. 2742; *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817; *Laxton*, 333 F.3d at 578; *West*, 330 F.3d at 385; *Sandstad*, 309 F.3d at 897. In doing so, "[t]he plaintiff must rebut each nondiscriminatory reason articulated by the employer." *Laxton*, 333 F.3d at 578 (citing *Wallace*, 271 F.3d at 220).

▇▇▇▇▇ While the presumption of discrimination is no longer operative once the employer meets its burden of production, "the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom' " may still be considered " 'on the issue of whether the defendant's explanation is pretextual.' " *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. 1089); *see Laxton*, 333 F.3d at 582. If "the evidence of pretext is substantial, the plaintiff may create a genuine issue of material fact without independent evidence that discrimination was the real reason for the adverse employment action." *Crawford*, 234 F.3d at 903 (citing *Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 372 (5th Cir.1997)); *see Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *Laxton*, 333 F.3d at 585. The plaintiff's assertion of pretext, however, must be supported by more than mere self-serving, subjective, or speculative allegations; a plaintiff must provide sufficiently specific, substantive reasons for his claim of pretext. *See Nichols*, 81 F.3d at 42; *Molnar v. Ebasco Constructors, Inc.*, 986 F.2d 115, 119 (5th Cir.1993).

### a. *Goodyear's Safety Shoe Reimbursement Policy*

Anderson maintains that he was unlawfully discharged for violating Goodyear's Policy regarding safety shoe reimburse-

ment. At the time of his termination, the Policy, dated January 3, 2002, provided:

**5.0 Procedure**

5.1 Effective January 1, 1998, the company will reimburse eligible associates $90.00 per calendar year (January 1st through December 31st) on the purchase of Safety Shoes by the following options:

A. Eligible associates may use the $90.00 allotment on the purchase of one pair of safety shoes for their personal use.

B. Eligible associates may use $45.00 on each purchase of two pairs of safety shoes for their personal use.

5.2 The shoes may be purchased through On–Site Vendor safety shoe store or they may be purchased from Off–Site vendors. All Safety shoes must comply with the PPE policy, BMT–STD–0353.

Goodyear's policy BMT–STD–0353 refers to protective equipment and foot protection and states:

**5.2.5 Foot Protection**

(1) Safety footwear is classified according to its ability to meet minimum requirements for both compression and impact tests. These requirements and testing procedures may be found in the American National Standards Institute standards. Protective footwear purchased after July 5, 1994, must comply with ANSI Z41–1991.

a) Safety shoes are not required in plant offices, plant lunch rooms, process control rooms, Services Building, Administration Building; on the main road from the gate to the Lab/Core Maintenance Shop area and when traveling to and from a work station when entering or leaving the plant, if it is not necessary to travel through an operation area.

b) Those associates whose normal work area does not require safety shoes, but who may be called upon at a moment's notice to enter an operating area requiring safety shoes due to an emergency situation or to handle a process problem, will be required to wear safety shoes at all times.

c) Safety shoes are not required if it is medically certified that an associate cannot wear them.

d) Visitors are required to wear safety shoes; not steel-toed or composite-toed.

Finally, ANSI Z41–1991, entitled "American National Standard for Personal Protective Footwear," provides:

**5.10.2 Types of Foot Protection**

(1) IMPACT AND COMPRESSION RESISTANT FOOTWEAR—Impact and compression resistance is a test of a shoe's capacity to protect the toe area of the foot against falling objects or heavy rolling objects such as a fork lift. The toe area is protecte [sic] by using protective toe cap construction, commonly referred to as "Steel Toes", although some safety shoes provide a non-metallic protective cap that is equally effective.

b. *Interpretation of the Policy*

Although Anderson concedes that he never looked at the company's standards to determine what was considered a safety shoe until this incident, he argues that Goodyear's interpretation of the Policy is flawed and "contrary to its terms." While Anderson owned several pairs of steel-toed shoes, he maintains that, at the time he was terminated, there was nothing in the Policy indicating that he could only be reimbursed for steel-toed shoes. In his affidavit, Anderson states that he understood the Policy to mean that he could be reimbursed for shoes for his "personal

use" up to $90.00 each year. Relying on the Policy, Anderson sought reimbursement for a pair of "Justin Roper" boots on April 16, 2002, which was subsequently denied. He contends that "nothing in the policy mention[s] that the shoes are for work use, or that they need to be steel-toed shoes."

An examination of the Policy in effect at the time of Anderson's termination reveals no mention of "steel-toed shoes" except to distinguish them from "safety shoes" under the visitors section of BMT–STD–0353. In addition, the Policy recognizes steel-toed shoes as well as those containing a non-metallic protective cap as approved types of safety shoes under the ANSI standard. Nowhere does the Policy specifically state that reimbursement is limited to steel-toed safety shoes. At deposition, Anderson testified that he previously bought and was reimbursed for shoes without steel toes.

Q. Had you ever purchased any shoes that you—for which you had turned in a request for reimbursement previously, that did not have steel toes?

A. Uh-huh.

Q. How many times did you do that?

A. I don't remember. I just had bought them before, same place. I didn't—I would use my—I used different shoes and stuff to do different things. Say, for example, I had a pair of shoes at work that I would use to go into Wing Chemical because of the glue. We used a pair of shoes or whatever to stay in the office, or whatever, you know. We—you didn't have to have steel toes anywhere on this side of the tracks (indicating). And when we'd come out for training or whatever, you didn't have to have steel toes. Unless you went down into the plant, you were not required to have steel toes.

 \* \* \* \* \* \*

Q. Is it your testimony that as a member of plant protection, you didn't have to have safety shoes on your feet at all times while you were on duty?

A. Up until I read this incident, it was—I did not realize that I had to have steel toes on at all times because—because 99 and nine-tenths of all of us in plant protection wore tennis shoes or whatever in our office. We didn't wear steel toes.

Q. Did—

A. We only put them on—we would change shoes when we went down to the plant. So, we came comfortable. We wore whatever that we had or whatever we might have bought.

Included in the record are receipts verifying Anderson's statement that he had previously bought and was reimbursed for non-steel-toed shoes. On July 13, 2000, Anderson submitted a receipt for Wolverine athletic shoes, but there is no indication as to whether he received reimbursement from Goodyear. The following year, Anderson submitted another request for reimbursement, attaching a receipt from Academy dated August 11, 2001, for a second pair of Wolverine athletic shoes as well as a pair of New Balance athletic shoes. On August 16, 2001, he was reimbursed $90.00 for those shoes. There is nothing in the record suggesting that any adverse action was taken against Anderson for seeking or obtaining reimbursement for those shoe purchases.

In addition, Anderson testified at deposition that he considered a work boot to be the same thing as a safety shoe. As a consequence, he bought the "Justin Roper" boots because they were touted as "a new work boot that had—Justin had just come out with." He explained that because he had purchased and was reimbursed for

work boots previously, he assumed they were the same thing as safety shoes.

Furthermore, the record contains evidence that other employees violated the Policy but were not terminated. Greg Hamilton ("Hamilton"), the Human Resources Manager at Goodyear's San Antonio plant, testified at deposition that, while Manager of Employment and Human Resources Services at the Beaumont plant prior to 2003, he learned of an incident where an employee attempted to obtain reimbursement for shoes purchased for someone else. At deposition, Hamilton elaborated:

Q. Do you know of anyone else at the Beaumont plant violating the policy that we've been talking about, the shoe reimbursement policy, by submitting a request for reimbursement for nonsteel-toed shoes other than Mr. Anderson?

A. Well, I heard of an incident in the past before I got there; but I wasn't involved in it.

Q. What did you hear?

A. There was somebody that tried to get reimbursed for shoes for somebody other than themselves.

\* \* \* \* \* \*

Q. Do you know who this person was that allegedly submitted these shoes for somebody else?

A. I believe a woman by the name of Jane Crain, I believe was her name.

\* \* \* \* \* \*

Q. Do you know whether Ms. Crain was fired for violating the safety shoe reimbursement policy?

A. No.

Q. No, you don't know that?

A. No, she wasn't fired for safety shoe violation. The reason I say that was because she was still employed there when I got there.

Goodyear also proffered evidence, through the affidavit of Sue Brown, the former Human Resources Manager at the Beaumont plant, that an unnamed shipping clerk, with the initials LJM, violated the Policy in 1996 by authorizing another person to use her safety shoe allowance. LJM was suspended, rather than terminated, and was required to sign a letter of commitment.

Goodyear, however, interprets the Policy to restrict reimbursement to costs incurred for "steel-toed shoes" only. According to Pickette's affidavit, "[t]hroughout my service as Human Resources Manager at the Beaumont plant, I understood that the term 'safety shoes' referred to steel-toed shoes." Pickette further claims that he asked Anderson "whether he understood that the only shoes which were to be reimbursed under the safety shoe reimbursement policy were steel-toed shoes," to which Anderson allegedly agreed. Another employee, Cone, also states in his affidavit that he understands the Policy to refer only to steel-toed shoes, not to other work boots or shoes.

Goodyear asserts that it was not aware of any other plant employees seeking reimbursement for shoes without steel toes. McCown testified, however, that Goodyear, while it was capable of doing so, did not attempt to determine whether any other Plant Protection associates had submitted reimbursement requests for non-steel-toed shoes. Pickette, in his affidavit, states that he was suspicious of Anderson's actions "because he had signed off on his own reimbursement form." Although Goodyear emphasizes that Anderson was the only associate in Plant Protection to sign off on his own reimbursement voucher, McCown stated that he did not know of any policy that prevented an employee from signing off on his own requisition

form. In fact, according to McCown's affidavit, "Plant Protection employees were supposed to sign off on shoe reimbursement requests from all other plant employees before those reimbursement forms were sent to the accounting department for review." Additionally, one of the major responsibilities of Plant Protection personnel, according to the record, was to "handle ordering and selling of safety shoes." Hence, it appears that one of Anderson's duties was to sign off on reimbursement requests for safety shoes.

Anderson lastly argues that Goodyear's interpretation of the "personal use" portion of the Policy "defies common sense and usage of that phrase." Anderson asserts that "personal use" means non-work related. In support of his contention, he refers to the deposition testimony of Hamilton, who, in response to questioning, testified that "personal use" means "[s]hoes that I would wear outside of work." Hamilton later testified, however, that Goodyear does not reimburse an employee for shoes to wear outside of work. He explained that the definition of "personal use" in the Policy means that an employee can obtain reimbursement only for shoes for himself or herself and not for anyone else. Anderson points out that the inconsistencies in Hamilton's statements about "personal use" undercut Goodyear's position that safety shoes are intended only for work.

### c. *Changes to the Policy*

Anderson further contends that changes made to the Policy after his termination constitute additional evidence of pretext. Anderson alleges that Goodyear changed the Policy after he was discharged to clarify that what he did constituted a violation. He maintains that "such change belies that [sic] fact that Goodyear's excuse was legitimate."

According to McCown, the Policy was revised after Anderson was terminated to clarify the definition of safety shoes. Changes were made to the text of the Policy as well as to the designation of the persons responsible for signing off on reimbursement forms. At deposition, McCown testified:

Q. And later did—was the shoe policy clarified to remind people that they could only get reimbursed for steel or composite toed shoes?

A. Yes.

Q. When was that done?

A. After the incident—when we revised the policy after Mr. Anderson's incident.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Why did you want to modify the shoe reimbursement policy?

A. To take the responsibility of having to sign for reimbursement for the Plant Protection group and route it through myself.

Q. Did you also want to make sure that nobody made the kind of mistake that Mr. Anderson made?

A. Yes.

Q. Did you feel the policy itself could be clear—more clear?

A. Yes.

Goodyear argues that "[w]hether the policy could have been written differently has nothing to do with whether [Goodyear] truly discharged [Anderson] because [Goodyear's] decisionmakers concluded that [Anderson] had violated a rule they believed to be clear and well understood—employees were entitled to reimbursement for only steel toed shoes." Goodyear further asserts that whether instructions given to an employee were vague or ambiguous or whether the Policy was inarticulate is not of ultimate importance. Rather, Goodyear maintains that the crux of the legal analysis rests with whether Goodyear

discriminated against Anderson on the basis of age. While age discrimination is the ultimate issue for trial, a finding of pretext may be determinative at the summary judgment stage.

### 4. *Age–Based Animus*

In response to Goodyear's motion for summary judgment, Anderson points to several incidents he attributes to age discrimination. Anderson states that, as the oldest employee in his department, "he began noticing that he became the target of criticism directed at him even though he was not involved." In support of his argument, Anderson notes that he was reprimanded for issues concerning pornography in 1999 even though he was not involved. In addition, Anderson contends that he was unfairly targeted and reprimanded when he left the plant to attend a sheriff's meeting even though he made sure he had a backup at the plant during his temporary absence. Anderson also maintains that no policy existed prohibiting him from leaving the plant for a short period of time if he had a backup. Finally, he argues that Goodyear's reasons for terminating him, based on allegations of fraud, are implausible and, therefore, highly probative of intentional discrimination.

In his Second Amended Complaint, Anderson alleges that Goodyear's discrimination against older employees was open and obvious and "accepted as the mondus [sic] operandi or normal operations procedure of [Goodyear]." At deposition, Anderson testified that he believed Goodyear discriminated against him because of his age in not selecting him for the Lead Incident Commander position. Anderson elaborated:

Q. Did anyone ever do or say anything to indicate that you, Mr. Anderson, were not selected for a lead incident commander position because of your age?

A. There were statements made that nothing would change until they got rid of me, which indicated to me that because of my age and me being of the old way or the way we had done things at Goodyear, that with the new incident command and the change, they wanted younger people.

Q. And who are you alleging stated that nothing would change until the company got rid of you?

A. Some of the younger guys that came back that—different people just made statements that said that they made statements to that effect.

Anderson also testified that some "guys in the department a lot of times would refer to me as the old man" or would say "[b]e careful, old man. Don't hurt yourself." Anderson, however, could not recall who had made these comments or when they were made. In addition, Anderson alleges that when Goodyear eliminated the position of shift foreman, it "forced guys out of the lab, older guys, into retirement and back into other positions and then put younger guys, inexperienced guys, in those positions." Anderson argues that Goodyear's restructuring had an adverse impact on almost all the older employees. Anderson contends that he was affected by this restructuring when younger, less qualified employees were promoted to Lead Incident Command over himself. Anderson alleges that, as a result, he was subjected to a pattern of age discrimination culminating with his termination over the safety shoe incident.

### 5. *Evidence of Discrimination after Reeves*

Goodyear argues that Anderson "has utterly failed to dispute the reason for the termination articulated by [Goodyear]," and that there is "no evidence, direct or

otherwise, that age was a motivating factor." According to Goodyear, Anderson does not provide proof of age-related comments or other age-based animus from any supervisors, decisionmakers, or Human Resources personnel. Anderson asserts that Goodyear's legal argument concerning evidence of pretext is entirely premised on the "pretext-plus" precedent overruled by the United States Supreme Court in *Reeves*. *See* 530 U.S. at 146–47, 120 S.Ct. 2097. Anderson contends that the evidence clearly establishes genuine issues of material fact sufficient to defeat Goodyear's motion for summary judgment.

The United States Court of Appeals for the Fifth Circuit, in a recent opinion, discussed the difference between the plaintiff's burden of production on summary judgment pre-*Reeves* as compared to the plaintiff's burden post-*Reeves*. *See Kanida v. Gulf Coast Med. Personnel LP*, 363 F.3d 568, 574–75 (5th Cir.2004). In *Kanida*, the court observed:

> In *Reeves*, the circuit court understood Supreme Court precedent to require plaintiffs to produce evidence that the employer's purported justifications were pretext "plus" additional evidence of actual discrimination, and held that judgment as a matter of law for the defendant was appropriate in that case because the plaintiff failed to produce any additional evidence.

*Id.* at 574. The Supreme Court in *Reeves* determined that the Fifth Circuit had misconstrued the plaintiff's evidentiary burden "because 'a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'" *Id.* (quoting *Reeves*, 530 U.S. at 146–48, 120 S.Ct. 2097). "Thus, *Reeves* was intended to clarify the judiciary's understanding of the evidentiary burden of production plaintiffs must meet to survive *McDonnell Douglas* burden shifting analysis." *Id.* (citing *Reeves*, 530 U.S. at 146–47, 120 S.Ct. 2097).

Applying the pretext analysis post-*Reeves*, Anderson has satisfied his evidentiary burden. He has provided sufficient circumstantial evidence to rebut Goodyear's proffered justification for terminating him, thus creating an inference that Goodyear's explanation was a pretext for discrimination. Although Goodyear asserted a legitimate non-discriminatory reason for discharging Anderson, satisfying its burden of production, Anderson has raised genuine issues of material fact as to whether he actually violated Goodyear's Policy and whether Goodyear believed in good faith that he had done so. *See Rachid*, 376 F.3d at 315; *Walker v. Fred Nesbit Distrib.*, 331 F.Supp.2d 780, 788 (S.D.Iowa 2004).

Anderson has produced evidence that his purchase of shoes was in compliance with the Policy as he understood it and as it was written. He has adduced evidence that he made similar purchases of non-steel-toed shoes in the past and was reimbursed under the Policy. He has also shown that other employees who engaged in similar conduct in violation of the Policy were not terminated. Moreover, Goodyear's failure to investigate whether other employees had also sought reimbursement for non-steel-toed shoes and Goodyear's revision of the Policy after Anderson's departure undermine Goodyear's rationale for terminating him. In addition, although Anderson had been reprimanded twice before for alleged misconduct, at the time of his termination, Anderson's supervisors were satisfied with his performance.

While there is little evidence of age-based animus, Anderson has presented sufficient evidence under *Reeves* from which the jury could infer that Goodyear's justification for terminating him is unwor-

thy of credence. As a consequence, the evidence in the record undercutting the validity of Goodyear's justification for terminating Anderson, combined with his *prima facie* case, is sufficient to permit Anderson to proceed to trial on his claim that Goodyear unlawfully discriminated against him based on his age. *See Reeves*, 530 U.S. at 147, 120 S.Ct. 2097. Thus, the existence of genuine issues of material fact preclude summary judgment.

### III. *Conclusion*

Under these circumstances, Anderson has presented sufficient evidence to raise a fact issue as to whether Goodyear's articulated reason for discharging him was the actual motivation for its decision. Further, he has produced adequate circumstantial evidence to permit a jury to determine whether his age was a motivating factor in Goodyear's decision to terminate his employment. Therefore, with respect to Anderson's claim under the ADEA, summary judgment is not warranted. All other claims asserted by Anderson in his Second Amended Complaint have been abandoned, and summary judgment is appropriate with respect to those claims.

IT IS SO ORDERED.